**LSR JOINT VENTURE NO. 2, Morris Robinowitz, Raymond S. Lambert and the Federal Deposit Insurance Corporation, Receiver for Security Bank, Appellants,**

v.

**Dr. Robert A. CALLEWART, Appellee.**

No. 05–90–00797–CV.

Court of Appeals of Texas,
Dallas.

Aug. 7, 1992.

Rehearing Denied Oct. 1, 1992.

Joe Bailey Hyden, Howard F. Carter, Jr., Lawrence F. Maxwell, Jr., Anne Smith Crowe, Gary E. Smith and Hubert A. Crouch, III, Dallas, for appellants.

Charles V. Serafino and Bruce W. Bowman, Jr., Dallas, for appellee.

Before STEWART, OVARD and BURNETT, JJ.

## OPINION

OVARD, Justice.

We overrule both LSR's and Callewart's motions for rehearing. We withdraw our opinion of January 16, 1992, and vacate our judgment of that date. This is now the Court's opinion.

This is a fraud and Deceptive Trade Practices–Consumer Protection Act (DTPA) case concerning the purchase of a building. Dr. Robert A. Callewart originally sued Thomas C. Brandenburg, Peter A. Lusk, LSR Joint Venture No. 2, Raymond S. Lambert, Morris Robinowitz, Forecast Consultants, Inc., Mel Stein, RepublicBank Dallas, N.A., Henry S. Miller, and John S. Robertson, claiming misrepresentations and omissions during the sale of a building he purchased from them. The FDIC intervened claiming an interest in the proceeds of a note executed by Callewart during the

purchase. After a jury trial, the trial court entered judgment in favor of Callewart and awarded him $1,231,915.60 in damages. The trial court denied the FDIC's claims.

In twenty-eight points of error LSR, Robinowitz, and Lambert argue that the trial court erred in failing to credit the amounts contained in settlement agreements against the judgment; awarding damages based on an erroneous definition of "out of pocket" expenses; excluding evidence of the dollar amount of tax benefits; and awarding exemplary damages. They also contend that certain trial court rulings during trial were in error.

The FDIC appeals, claiming that the trial court erred in failing to grant judgment in its favor against Callewart under (1) the federal common-law holder-in-due-course doctrine, and (2) the D'Oench, Duhme [1] doctrine and its statutory codification.

Because we hold that the trial court erred in (1) excluding evidence of the dollar amount of tax benefits Callewart received from the Sigma Property purchase and (2) awarding damages based on an incorrect definition of "out of pocket," we reverse the judgment and remand the cause for a new trial. Our decision to reverse the cause on the two points above sends the entire case back for new trial, and we decline to address LSR's remaining points, as determination of them would result in advisory opinions on those matters. Because the FDIC did not assert its claims and defenses at the trial level, we hold the FDIC did not preserve error for review. We affirm the trial court's judgment regarding the FDIC's claims.

## FACTS PERTINENT TO OUR HOLDING

### The Fraud

In December 1984, Callewart purchased a building known as the Sigma Property from LSR, a joint venture composed of Lambert, Stein, and Robinowitz. Callewart agreed to pay over $5,570,000 for the property, including a down payment of about $575,000 and a $475,000 promissory note

---

1. *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

(the Callewart note, which Callewart executed in favor of LSR). LSR in turn pledged the Callewart note to Security Bank to secure a $147,795 note it had made payable to Security Bank (the LSR note).

Within a month of the closing, Callewart's investment experienced problems. Contrary to assurances made by LSR, three of the five Sigma property tenants failed to pay their rent, and nonpaying tenants moved out. Callewart could not find replacement tenants. Callewart financed the venture for eighteen months, but eventually allowed foreclosure on the building in June 1986. Before foreclosure, in September 1985, Callewart sued (1) LSR, Robinowitz, and Lambert for common-law fraud and DTPA violations; (2) tenant B & L for delinquent rental payments; (3) real estate broker Miller Co. for failing to uncover LSR's fraud; and (4) tenants Stein and Forecast for participation in LSR's fraud and for failure to pay rent. LSR counterclaimed against Callewart alleging nonpayment of the Callewart note. All of these actions were consolidated into one suit.

### The LSR/Security Bank Settlement Agreement

On May 11, 1988, LSR and Security Bank entered into a settlement agreement in which LSR agreed that following trial, the court could enter judgment in favor of Security Bank for $157,412.10, the amount of the LSR note plus interest, costs of court, and Security Bank's reasonable attorney's fees. In November 1988, the FDIC, as receiver of Security Bank, intervened in the suit claiming a security interest in the $475,000 Callewart note, which was used to secure the LSR note executed to Security Bank. In its plea in intervention, the FDIC claimed that as receiver of the bank, it had succeeded to Security Bank's interest in the LSR and Callewart notes. None of the parties filed a response to the FDIC's plea in intervention. The FDIC was present and observed the entire trial, but it did not present any evidence.

### The Miller and B & L Settlement Agreements

In August 1989, the case went to trial. On the morning of trial, about an hour before voir dire, Callewart notified all the parties that he had negotiated to settle with Miller and B & L the day before and that the settlement terms were to be finalized that morning. Although all of the terms of the settlements were not disclosed prior to trial, LSR was informed early in the trial as to the amounts of the settlements and a provision in the Miller settlement indemnifying Callewart. Callewart settled with Miller for approximately $530,-000, and with B & L for $300,000. During the fourth week of trial, the court ordered full disclosure of the Miller settlement. LSR, however, failed to request or obtain full disclosure of the B & L settlement until after trial.

### The Tax Benefits

During trial, LSR presented evidence regarding the tax benefits Callewart received from his purchase of the Sigma property. Although the trial court allowed LSR to present general information about the benefits Callewart was allegedly receiving from the Sigma purchase, it would not let LSR disclose the actual dollar amount of those benefits. LSR objected to the trial court's ruling, complaining that such specific information was relevant to its theories of rescission, damages, ratification, and waiver.

### The Outcome

Prior to the close of the evidence, LSR dismissed a cross-claim it had filed against Miller Company and Robertson and released them from the suit. In October 1989, the jury returned a verdict in favor of Callewart and against LSR, Robinowitz, and Lambert jointly and severally for over $1,230,000. Additionally, the trial court denied the FDIC's claims to the LSR and Callewart notes. Both LSR and the FDIC appeal the judgment.

LSR'S APPEAL

## THE TAX BENEFITS

In its seventh point of error, LSR complains that the trial court erred in excluding evidence of the dollar amount Callewart received in tax benefits from the purchase of the Sigma Property. The trial court allowed LSR to comment generally about Callewart's tax benefits. The court did not allow LSR to introduce evidence of the actual dollar amount of those benefits. LSR contends that the actual dollar amount of tax benefits was (1) relevant and crucial to prove that Callewart ratified or waived the alleged fraud and (2) required to show Callewart's true damages.

Citing *Randall v. Loftsgaarden*, 478 U.S. 647, 662–64, 106 S.Ct. 3143, 3152–53, 92 L.Ed.2d 525 (1986),[2] Callewart argues that the trial court was correct in denying admission of the actual dollar amount of Callewart's benefits because "a party's recovery is *not* offset by tax benefits." (emphasis added). While we agree that *Randall* prevents a jury from offsetting damages with tax benefits, we do not believe that it prevents a fact-finder from considering tax benefits about the issues of ratification and waiver. We conclude that the trial court erred in preventing LSR from introducing evidence of the specific dollar amount of Callewart's tax benefits for the limited purpose of proving ratification and waiver.

Facts Pertinent to the Tax Benefits Issue

The Motion in Limine

Before trial, the trial court granted Callewart's motion in limine preventing LSR from introducing Callewart's tax returns as evidence of the tax benefits Callewart received from the Sigma Property purchase. The court instructed the parties to approach the bench before "getting into" evidence of Callewart's tax benefits and stated that it would "consider it at that time."

Testimony at Trial

During trial, the court allowed LSR to introduce evidence that Callewart anticipated and received tax benefits from his purchase of the Sigma Property. Callewart testified that the tax savings he received from the purchase of the property were critical to his decision to purchase the Sigma property. He said that it was very likely that he would not have bought the building if he were not going to receive some tax savings from it. Callewart said that he did receive substantial tax benefits from the property. He explained that one of his motivations for purchasing the Sigma Property was to set up a shelter for his medical-practice income.

The trial court would not allow LSR to introduce the actual dollar amount of tax benefits Callewart received. During a series of bench conferences, outside the presence of the jury, LSR's counsel urged the introduction of Callewart's 1984 through 1987 tax returns. LSR's counsel argued that the dollar amount of Callewart's tax benefits was relevant on the issues of (1) reliance and inducement, (2) damages, and (3) ratification. He insisted that the jury needed to know the "magnitude" of the benefits, stating "it makes a lot of difference whether one dollar or five hundred thousand dollars, and that's something the tryer [sic] of fact really needs to know to be able to make an intelligent assessment and decision." LSR's counsel suggested that the court could give the jury an instruction limiting the jury's consideration of the evidence to certain issues.

Callewart's counsel countered that the only reason LSR wanted to introduce Callewart's tax returns was to "reduce damages by tax savings." While Callewart's counsel admitted that "on ratification, even saying that, you know, tax benefits were taken after he [Callewart] bought the property, there's not any question about that. If that's the issue, they are entitled to do that." He added, however, that "really, what they want to show, though, is the amount, and that's what's not relevant, be-

cause it's simply not relevant to reduce damages."

The trial court denied admission of Callewart's tax returns. The trial court neither stated with precision the grounds for its decision to exclude the specific amounts of Callewart's tax benefits nor specifically invoked rule 403 of the Texas Rules of Civil Evidence. The court admitted that ratification was the "crux" of the case and that the tax benefits were relevant to that issue. It concluded, however, that the specific amounts of tax benefits would not be admissible, stating, "I don't think the dollar amounts are probative." In light of counsels' arguments before the bench, we determine that the trial court excluded the dollar amount evidence because it believed that its prejudicial and confusing potential substantially outweighed its probative value. LSR made a limited offer of portions of Callewart's 1984 through 1987 tax returns separately on the issues of damages, rescission, ratification, and waiver.

### Bill of Exceptions

In a bill of exceptions, LSR introduced the testimony of Richard A. Boysen, a partner at the accounting firm of Touche Ross. Boysen, who had a general overview function about Callewart's tax matters, testified from Callewart's 1984 through 1987 tax returns. He said that Callewart received over $500,000 in tax benefits from his purchase of the Sigma Property. According to Boysen, because of the Sigma Property, Callewart saved $34,604 in taxes in 1984, $261,202 in taxes in 1985, and $249,776 in taxes in 1986, for a total of $555,715 in tax savings for the three years combined. Boysen testified that due to the Sigma Property, in 1985 and 1986 Callewart had more tax deductions than he had actual income.

### Standard of Review

To determine whether the trial court erred in excluding evidence at trial we must determine whether the trial court abused its discretion. *Williams v. Union Carbide Corp.*, 734 S.W.2d 699, 703 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd

n.r.e.). Any evidence that tends to prove or disprove any material fact involved in the issue being tried or sheds light on the occurrence involved is relevant and material. *Lone Star Gas Co. v. State*, 137 Tex. 279, 153 S.W.2d 681, 699–700, *cert. denied*, 315 U.S. 8, 62 S.Ct. 418, 86 L.Ed. 579 (1942); *Trans–State Pavers, Inc. v. Haynes*, 808 S.W.2d 727, 731 (Tex.App.— Beaumont 1991, writ denied). All relevant evidence is admissible and should not be excluded without "very good cause." TEX. R.CIV.EVID. 402; *Davis v. Davis*, 521 S.W.2d 603, 607 (Tex.1975); *Williams*, 734 S.W.2d at 703.

Rule 403 of the Texas Rules of Civil Evidence allows the exclusion of relevant evidence only when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *Williams*, 734 S.W.2d at 703. However, because rule 403 permits exclusion of probative evidence, it is an extraordinary remedy that must be used sparingly. *See Dartez v. Fibreboard Corp.*, 765 F.2d 456, 461 (5th Cir.1985). To properly apply rule 403, the trial court must balance and weigh the probative effect of the evidence against its potential for unfair prejudice or confusion. In weighing the probative value of the evidence against the danger of unfair prejudice, the court must first examine the necessity for and probative effect of the evidence. *Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 863 (5th Cir.1983) (interpreting Texas law). A second factor to be taken into consideration is whether the same facts could have been proved by other evidence. *Id.* Only if the probative value of the evidence is substantially outweighed by the prejudicial effect is exclusion proper. *Id.*

To convince this Court to reverse a judgment based on error in the exclusion of evidence, LSR must show that (1) the exclusion of the evidence was error and (2) the admission of the evidence probably would have had an effect on the jury's assessment of the entire case. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989); TEX.R.APP.P. 81(b)(1). LSR is not required to prove that *but for* the

erroneous exclusion of the evidence, a different judgment *would* have resulted. *Texas Power & Light Co. v. Hering*, 148 Tex. 350, 353, 224 S.W.2d 191, 192 (1949); *Castro v. Sebesta*, 808 S.W.2d 189, 192 (Tex.App.—Houston [1st Dist.] 1991, no writ). LSR need show only that an improper judgment *probably* resulted. *King v. Skelly*, 452 S.W.2d 691, 696 (Tex.1970); *Castro*, 808 S.W.2d at 192.

Application of Law to Facts

■ LSR sought to introduce the tax evidence to prove its defensive theory that Callewart either ratified the Sigma purchase in spite of any fraud or waived such cause of action for fraud.[3] The common-law defense of ratification and waiver defeats recovery under all theories pleaded except DTPA claims, which are not subject to common law defenses. *See Shenandoah Assoc. v. J & K Properties*, 741 S.W.2d 470, 496 (Tex.App.—Dallas 1987, writ denied). Because the jury found that LSR had committed (1) common law fraud, (2) real estate fraud, and (3) negligence, as well as DTPA violations, and because the charge failed to separate causes of action for determination of damages, we conclude that determination of the ratification and waiver issue was material and critical to the outcome of the case.

■ In order to prove ratification or waiver, LSR had to show that Callewart either (1) continued to accept benefits under the Sigma transaction after he became aware of the fraud or breach or (2) conducted himself so as to recognize the Sigma transaction as binding. *See Spangler v. Jones*, 797 S.W.2d 125, 131 (Tex.App.—Dallas 1990, writ denied). The burden was on LSR to prove that (1) Callewart had *full knowledge* of the fraudulent acts or breach at the time of ratification and (2) Callewart *intentionally chose* to ratify the contract in spite of the alleged fraud. *See id.*

■ It is uncontroverted that Callewart knew about the fraud at the time of the alleged ratification and waiver. Callewart,

himself, testified that within one month after the Sigma purchase, he was aware that three to five of the tenants failed to pay their rent, stating that "three of the five didn't pay [their rent] within the first five days after I owned it [the Sigma Property]." In addition, Callewart stated that in February of 1985, nonpaying tenants moved out of the Sigma Property and he could not find replacement tenants.

It is also uncontroverted that Callewart held the Sigma Property for one and one-half years after becoming aware of the alleged fraud without filing a cause of action. Further, Callewart prevented foreclosure on the property until June 1986, some eighteen months after he purchased the property.

LSR also attempted to prove that Callewart ratified the transaction or waived any fraud because the tax benefits he was receiving from the transaction exceeded any accumulated debt. However, the trial court only allowed LSR to present general evidence that Callewart did receive "some" kind of tax benefits:

[LSR'S ATTORNEY]: (By Mr. Davis) But you know, don't you, we would be correct in concluding, then, that you received substantial tax benefits in the years we're talking about because of the property?

[CALLEWART]: Some benefits, yes. I don't know the parameters of substantial.

[LSR'S ATTORNEY]: Right. You may not know the exact numbers, but you received substantial benefits, didn't you?

[CALLEWART]: Yes.

By ruling that LSR could not introduce evidence of the dollar amount of Callewart's tax benefits, the trial court effectively prevented LSR from showing the jury that Callewart *intentionally chose* to ratify the Sigma transaction despite the alleged fraud. From the testimony above, the jury could not have known whether "substantial" meant that Callewart re-

---

**3.** We reiterate that both parties, as well as the trial judge, agreed during trial that evidence of Callewart's tax benefits was relevant on the issue of ratification. The only question on appeal is whether the *dollar amount* of those benefits was relevant.

ceived $500, $50,000, or $550,000 in tax benefits. We conclude that the trial court erred in requiring the jury to make a decision on ratification and waiver in this case without reference to the dollar amount of tax benefits.

In reaching our decision, we find persuasive the courts reasoning in *Bridgen v. Scott*, 456 F.Supp. 1048 (S.D.Tex.1978). In *Bridgen*, limited partners sued the general partner under the Securities Acts of 1933 and 1934 after the limited partners received tax benefits, but no profit from a speculative real estate investment. The court permitted the general partner to introduce *detailed* evidence of the tax consequences of the investment in connection with the issue of whether misrepresentation actually occurred. *Bridgen*, at 1053–54, 1061. The court reasoned that "a finder of fact simply cannot understand a transaction of this nature without a basic understanding of the tax consequences." *Bridgen*, at 1062. For support, the *Bridgen* court referred to the decision of the United States District Court for the Southern District of New York in *Cooper v. Hallgarten & Co.*, 34 F.R.D. 482 (S.D.N.Y.1964). In *Cooper*, the court reasoned that in connection with a high-risk oil and gas deal sold to a high-bracket doctor:

> There can be little doubt of the high degree of risk and the speculative nature of the oil and gas ventures, or that plaintiffs sought a tax-favorable outlet for his funds; as much appears to be conceded by the moving papers. In any event, plaintiff may be *fully questioned* with respect thereto as tending to support not only the defendants' denial of misrepresentation, but also to rebut plaintiff's claim of reliance thereon.

*Id.* at 484 (emphasis added). *Cooper* supports the *Bridgen* court's view that tax considerations in a high-risk, speculative venture are highly relevant. *Bridgen*, 456 F.Supp. at 1062. The *Bridgen* court further concluded:

> Requiring the jury or this Court to try this case without reference to the tax consequences of the transaction would be requiring the jury and the Court to live in an artificial "never-never land." The plaintiff's position that the tax conse-

quences of this transaction should be ignored is simply not realistic and is tantamount to requesting this Court and the jury to try this case blindfolded.

*Bridgen*, at 1061.

Additionally, we are persuaded that a fact-finder cannot completely understand a high-risk, speculative real estate transaction, such as the Sigma property transaction, without a basic understanding of the tax consequences. Furthermore, in order to fully appreciate the relevance of Callewart's tax benefits, we determine that the fact-finder must be informed of the actual dollar amount of such benefits. To require the fact-finder to guess how much of an impact the tax consequences had on Callewart's decisions throughout the deal would be to require the jury to "try this case blindfolded." *See Bridgen*, 456 F.Supp. at 1061.

Moreover, at least one Texas state court has shown a willingness to admit evidence of tax benefits to negate causation or establish the truth or falsity of a fact. *See Tempo Tamers, Inc. v. Crow–Houston Four, LTD.*, 715 S.W.2d 658, 663 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). In *Tempo Tamers*, Tempo sued Crow for constructive eviction, misrepresentation, and wrongful sequestration stemming from a dispute between the two parties over Tempo's right to erect a sign for its nightclub in a shopping center parking lot. Tempo alleged that Crow's interference with its sign constituted constructive eviction, and it sought to recover all the costs of operating its nightclub as damages for the alleged constructive eviction. As an element of constructive eviction, it was incumbent upon Tempo to prove that Crow's interference with its sign caused it to abandon the shopping center and close its nightclub.

Tempo argued that the tax benefits evidence was irrelevant and thus inadmissible under rule 401. Crow responded that it introduced the evidence to show that Tempo vacated the shopping center as a result of the tax benefits to its parent corporation rather than due to the loss of the sign.

The trial court admitted the evidence, and this Court affirmed its actions stating:

> In light of the testimony of Donald Furrh and his accountant that Tempo's operating losses were a factor in his decision to purchase Lancaster's stock, testimony that Furrh, Inc. [the parent company] would enjoy an offset against future taxable income as a result of Tempo's operating losses would tend to establish that the loss of the sign did not cause Tempo to close the nightclub and vacate the shopping center. Thus, we hold that the evidence of tax benefits to Furrh, Inc. was admissible to disprove causation.

*Id.* at 663.

Similarly as an element of ratification, it was incumbent upon LSR to prove that Callewart *intentionally chose* to ratify the Sigma transaction because of the "substantial" tax benefits he received. In light of the testimony of Callewart and his tax advisor, Boysen, that (1) tax benefits were a factor in Callewart's decision to purchase the Sigma Property and (2) Callewart continued to receive tax benefits after he discovered the alleged fraud, we conclude that evidence that Callewart actually received $550,000 in tax benefits would tend to establish that Callewart intentionally chose to ratify the transaction to capitalize on the tax consequences.

Finally, while there is no indication in *Tempo Tamers* that Tempo's tax returns were admitted to show its tax consequences,[4] we determine that in LSR's case production of, or testimony from, Callewart's tax returns are the only effective methods LSR had to demonstrate that Callewart ratified the transaction or waived any alleged fraud in order to capitalize on the tax savings. *See Gross,* 695 F.2d at 863. And, to ensure that the jury did not violate the Supreme Court's holding in *Randall* that a damage award cannot be offset by tax benefits, we point out that the court could have given the jury an

instruction limiting consideration of the tax benefits evidence to the issue of ratification and waiver. TEX.R.CIV.EVID. 105.[5]

Accordingly, we conclude that the trial court's exclusion of the actual dollar amount of Callewart's tax benefits seriously hindered the presentation of LSR's case on ratification and waiver. LSR has shown that (1) the exclusion of the dollar amount was error and (2) the admission of the dollar amount of the benefits probably would have had an effect on the jury's assessment of the entire case. *See Gee,* 765 S.W.2d at 396. We hold that the trial court abused its discretion by excluding the evidence. We sustain LSR's point of error number seven.

## THE DAMAGES AWARD

In its fifth and sixth points of error, LSR, including Robinowitz and Lambert, contends that the trial court erred in submitting an incorrect definition of "out of pocket" to the jury which resulted in the award of improper actual damages. LSR complains that the trial court's instruction erroneously allowed the jury to consider all monies spent by Callewart, including the down payment, without taking into account any benefit that Callewart received from the bargain. Further, LSR complains that despite the fact that Callewart declined rescission and the trial court stated that rescission was impossible, the court submitted an instruction that improperly allowed the recovery of rescission damages.

■ Under common-law fraud and the DTPA, a plaintiff is entitled to recover either the "out of pocket" or the "benefit of the bargain" damages, whichever is greater. *See W.O. Bankston Nissan, Inc. v. Walters,* 754 S.W.2d 127, 128–29 (Tex. 1988). Here, the court elected to award "out of pocket" damages by submitting Jury Question No. 20:

---

4. The only indication of what kind of evidence was admitted is a vague reference to "testimony" and introduction of "numerous documents over Tempo's objections." *Tempo Tamers,* 715 S.W.2d at 663.

5. During the bench conferences about the admissibility of the tax benefit evidence, LSR suggested that the trial court could give the jury an instruction limiting the jury's consideration of the evidence to certain issues.

Find from a preponderance of the evidence the "out of pocket expenses" paid by Robert A. Callewart in the purchase of the Sigma property.

Answer in dollars and cents, if any.

ANSWER $___

In addition, the court tendered the following definition of "out of pocket expenses:"

In determining the "out of pocket expenses" as used in this QUESTION you may consider the following items: the cash paid at closing by ROBERT A. CALLEWART and any additional monies advanced on the Sigma property by ROBERT A. CALLEWART.

"Out of pocket" means the "difference between the value of that which was parted with and the value of that which was received." D. BRAGG, P. MAXWELL, & J. LONGLEY, TEXAS CONSUMER LITIGATION § 8.03, at 198 (2d ed. 1983); *see Nobility Homes, Inc. v. Shivers*, 557 S.W.2d 77, 78 n. 1 (Tex. 1977); *W.O. Bankston Nissan, Inc.*, 754 S.W.2d at 128. Here the court submitted an instruction on "out of pocket" which did not account for the value Callewart received.[6] It merely provided for the value with which he parted.

Callewart, however, argues that LSR waived any defect with regard to the "out of pocket" definition because it did not tender a substantially correct definition to the court. We disagree.

■ Where the trial court gives a definition and a party is not satisfied with it, all that a complaining party must do to preserve error is to file an objection to the court's definition specifically and clearly pointing out where the definition is in error. *Yellow Cab and Baggage Co. v. Green*, 154 Tex. 330, 333, 277 S.W.2d 92, 93 (1955); *Kold–Serve Corp. v. Ward*, 736 S.W.2d 750, 753 (Tex.App.—Corpus Christi 1987, writ dism'd by agr.). It is not necessary for an objecting party to tender a substantially correct definition unless the trial court omits such definition altogether. *See Ward*, 736 S.W.2d at 753.

■ At trial, LSR objected to the court's submission of Jury Question No. 20 on the grounds that it implied to the jury that any money Callewart put into the building or gave Miller Co. was a recoverable damage. LSR also complained that there was no way of distinguishing for what the money was spent or whether it was spent for expenses directly related to the property. We hold that LSR's objection specifically and clearly points out the error in the definition. It sufficiently put the trial court on notice that a proper definition does not encompass all the monies Callewart had spent on the property. Accordingly, we determine LSR properly preserved error.

■ Because the trial court awarded actual damages based on the jury's answer to question No. 20, it erred in awarding "out of pocket" damages which did not take into account any value Callewart may have received from the Sigma property purchase. *See Nobility Homes, Inc.*, 557 S.W.2d at 78 n. 1; *W.O. Bankston Nissan, Inc.*, 754 S.W.2d at 128–29. In addition, the trial court erred in allowing the jury to consider Callewart's down payment as part of his "out of pocket expenses." Awarding both actual damages and restoration of consideration paid are inconsistent remedies. *Kargar v. Sorrentino*, 788 S.W.2d 189, 191 (Tex.App.—Houston [14th Dist.] 1990, no writ) (citing *David McDavid Pontiac, Inc. v. Nix*, 681 S.W.2d 831, 835 (Tex. App.—Dallas 1984, writ ref'd n.r.e.)). We sustain LSR's fifth and sixth points of error.

Because sustaining any of LSR's remaining points would not result in rendition, we need not reach them. We reverse the trial court's judgment with regard to the dispute between LSR and Callewart and remand that portion of the cause for further proceedings consistent with this opinion.

### THE FDIC'S APPEAL

In three points of error the FDIC complains that the trial court erred in failing to

---

**6.** We note that while "the value Callewart received" may encompass things such as rentals paid, it would not include any tax benefits received. *See Randall*, 478 U.S. at 662–64, 106 S.Ct. at 3152–53.

grant judgment in its favor against Calle-
wart because (1) the FDIC is a holder in
due course; (2) Callewart did not properly
prove up any agreements alleged to dimin-
ish or defeat the FDIC's interest; and (3)
Callewart was estopped under the
*D'Oench, Duhme* doctrine from raising
any defense, setoff, or credit. The FDIC
seeks foreclosure of the Callewart note, the
balance of the LSR note, and attorney's
fees.

Callewart counters that the FDIC waived
its claims and defenses by asserting them
for the first time on appeal. Moreover, he
insists that the FDIC is not a holder in due
course and that neither the federal com-
mon-law *D'Oench, Duhme* doctrine nor its
statutory codification [7] apply to this case.
Because we agree that the FDIC has
waived its claims and defenses by asserting
them for the first time on appeal, we af-
firm the trial court's judgment with regard
to the FDIC's dispute with Callewart.

### WAIVER

■ Callewart contends that the
FDIC's holder-in-due-course status claim as
well as its *D'Oench, Duhme* and section
1823(e) defenses are affirmative claims and
affirmative defenses, the FDIC waived any
complaint as to their application by not
pleading or proving them at trial. We
agree with Callewart's characterization of
the FDIC's claims are affirmative claims
and affirmative defenses. And, in light of
the Texas Supreme Court's recent decision
in *Larsen v. FDIC/Manager Fund*, 835
S.W.2d 66 (Tex.1992) (not yet reported), we
agree that the FDIC waived its claims and
defenses by not pleading or proving them
at trial. We hold that the FDIC may not

assert them now, for the first time on
appeal.

### *Larsen v. FDIC/Manager Fund*

In *Larsen,* the Texas Supreme Court con-
sidered the question of whether Congress
intended section 1821(d)(13) [8] of the Finan-
cial Institutions Reform, Recovery, and En-
forcement Act of 1989 (FIRREA) to give
the FDIC the power to step in after judg-
ment as receiver for a failed financial insti-
tution and assert substantive federal
claims and defenses for the first time on
appeal. *Larsen,* 835 S.W.2d at 66. Prior
decisions from this Court gave the FDIC
broad powers to assert such federal claims
and defenses for the first time on appeal
with little to no limitation. *See
FDIC/Manager Fund v. Larsen,* 793
S.W.2d 37, 42 (Tex.App.—Dallas 1990),
*rev'd,* 835 S.W.2d 66 (1992); *FSLIC v. T.F.
Stone,* 787 S.W.2d 475, 480–81 (Tex.App.—
Dallas 1990, writ dism'd by agr.); *FDIC v.
F. & A. Leasing,* 800 S.W.2d 231, 236 (Tex.
App.—Dallas 1990, no writ). As the Texas
Supreme Court points out in *Larsen,* these
decisions were against the great weight of
federal authority on the issue and greatly
broadened the FDIC's authority under FIR-
REA and the *D'Oench, Duhme*-type de-
fenses. *Larsen,* 835 S.W.2d at 68–69; *see
Grubb v. FDIC,* 868 F.2d 1151, 1158–59
(10th Cir.1989); *Thurman v. FDIC,* 889
F.2d 1441, 1447 (5th Cir.1989); *Olney Sav.
& Loan Ass'n v. Trinity Banc Sav. Ass'n,*
885 F.2d 266, 275 (5th Cir.1989).

The Texas Supreme Court overruled *Lar-
sen* and held that "the federal courts have
correctly construed the federal statute not
to create such sweeping new substantive
rights." *Larsen,* 835 S.W.2d at 67. The
court expressly adopted the Eleventh Cir-

---

7. 12 U.S.C. § 1823(e) (1986). Section 1823(e) is
widely regarded as the statutory codification of
the *D'Oench, Duhme* doctrine. *E.g., FDIC v.
Blue Rock Shopping Center, Inc.,* 766 F.2d 744,
753 (3rd Cir.1985); W. Robert Gray, *Limitations
of the FDIC's D'Oench Doctrine of Federal Com-
mon–Law Estoppel: Congressional Preemption
and Authoritative Statutory Construction,* 31
S.Tex.L.Rev. 245 (1990). Section 1823(e) pro-
tects the FDIC from all agreements that dimin-
ish or defeat its interest unless the agreement
satisfies several requirements. The agreement
must be:

(1) in writing,
(2) executed by the bank and the persons
claiming adverse interests thereunder, includ-
ing the obligor, contemporaneously with the
acquisition of the asset by the bank,
(3) approved by the board of directors of the
bank or its loan committee, and
(4) recorded as an official record of the bank,
continuously from the time of its execution.

8. 12 U.S.C. § 1821(d)(13) (1986).

cuit's reasoning in *Baumann v. Savers Federal Savings & Loan Association*, 934 F.2d 1506, 1511 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992). In *Baumann*,[9] the Eleventh Circuit specifically rejected our decisions in *Larsen* and *Stone* based on statutory language:

> We agree with the *Olney* court that the statute does not give RTC in its capacity as conservator or receiver new substantive rights. RTC's reading of the statute [that it had the statutory right to assert federal defenses for the first time on appeal] would not only give RTC as conservator or receiver "all the rights and remedies" of RTC "in its corporate capacity," but would actually give RTC *greater* powers as conservator or receiver than in its corporate capacity. This is because neither FIRREA nor prior existing statutes grant RTC in its corporate capacity the power to raise arguments for the first time on appeal. Section 1821, which applies only to RTC acting as conservator or receiver, therefore, cannot grant this right merely by granting all the rights and remedies of RTC in its corporate capacity.

*Larsen*, 835 S.W.2d at 72 (emphasis original) (quoting *Baumann*, 934 F.2d at 1511). The Texas Supreme Court went on to hold that:

> FIRREA may offer an opportunity for FDIC (or RTC) to present an argument for the first time on appeal *because it never had power in the first instance before;*
>
> The federal appellate decisions are all in agreement: section 1821 does not give the FDIC the absolute new substantive right to assert *D'Oench Duhme*-type federal defenses for the first time on appeal. Under Texas procedure, absent "fundamental error" not in issue in this appeal, a court of appeals has no discretion to reverse an error-free judgment based on a new argument ("unassigned error in

the trial court") raised for the first time on appeal.

*Larsen*, 835 S.W.2d 74 (emphasis added) (citing *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex.1982); *McCauley v. Consolidated Underwriters*, 157 Tex. 475, 477–78, 304 S.W.2d 265, 266 (1957); TEX.CONST. art. V, § 6.).

■■■ In our case, there is no dispute that the FDIC took receivership of Security Bank eight months *before trial.* At that time, the FDIC filed a plea in intervention announcing that it was the successor in interest to all of Security Bank's interests. Because neither Callewart nor LSR opposed the FDIC's plea in intervention, the FDIC became a party to the litigation for all purposes. *Hughes v. Hughes*, 473 S.W.2d 304, 306–07 (Tex.Civ.App.—Beaumont 1971), *modified on other grounds,* 488 S.W.2d 64 (Tex.1972).

Moreover, during the trial, the FDIC made its presence obvious, participating in and monitoring all the proceedings. We conclude that this is not a situation in which the FDIC never had the power in the first instance at trial to assert its claims and defenses. Instead, the FDIC, as a party/intervenor, had the opportunity and duty to litigate its claims and defenses at the trial court level. *See Pirtle*, 629 S.W.2d at 920. Absent the requisite "fundamental error," we hold that the FDIC cannot now, for the first time on appeal, assert its *D'Oench, Duhme*-type claims and defenses. *See Larsen*, 835 S.W.2d at 73–74. We hold that the FDIC waived its claims and defenses by not presenting them at the trial court level. We affirm the trial court's judgment.

### FINAL DISPOSITION

We reverse and remand that part of the case involving the dispute between LSR and Callewart. We affirm the trial court's judgment with regard to the FDIC and hold that the FDIC has waived all its rights to present claims or defenses at the any

---

**9.** In *Baumann*, the court addressed the Resolution Trust Corporation (RTC) rather than the FDIC. We note, however, that because both the RTC and the FDIC function under the same statutory framework to assert *D'Oench, Duhme*-type defenses, the institutions may be used interchangeably in this instance.

possible new trial between LSR and Calle-wart.