NO. 07-05-0092-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



DECEMBER 30, 2005


______________________________



SABRINA E. CYPHERS, 



 Appellant


v.



THE STATE OF TEXAS, 



 Appellee

_________________________________



FROM THE 140TH DISTRICT COURT OF LUBBOCK COUNTY;



NO. 2004-404,739; HON. JIM B. DARNELL, PRESIDING


_______________________________





Memorandum Opinion


_______________________________


Before QUINN, C.J., and REAVIS and CAMPBELL, JJ.

 Sabrina E. Cyphers appeals from a judgment convicting her of possessing, with the
intent to deliver, more than four but less than 200 grams of cocaine. The conviction was
founded upon her open plea of guilty. The two issues before us concern the trial court's
refusal to allow her to withdraw her plea and the admission into evidence (during the
punishment phase of the trial) of an exhibit containing seven plus grams of cocaine. We
affirm the judgment.

 Issue One - Withdrawal of Plea

 Appellant initially contends that the trial court erred in refusing to allow her to
withdraw her plea. The request was made through appellant's pro se letter to the court. 
Furthermore, the letter was sent approximately two months after appellant pled guilty and
the trial court accepted the plea. We overrule the issue. 

 A defendant may withdraw his plea of guilty as a matter of right until judgment is
pronounced or the case is taken under advisement. Mendez v. State, 138 S.W.3d 334,
345 (Tex. Crim. App. 2004). Once the cause is taken under advisement, however, the
decision to permit the withdrawal of the plea lies within the trial court's discretion. Jackson
v. State, 590 S.W.2d 514, 515 (Tex. Crim. App. 1979); Stone v. State, 951 S.W.2d 205,
206-07 (Tex. App.-Houston [14th Dist.] 1997, no pet.). Furthermore, the request must be
timely. If belated, then it is not an abuse of discretion to deny it. See Jackson v. State, 590
S.W.2d at 515 (stating that the request to withdraw the plea was untimely when it was
made six weeks after the matter had been taken under advisement); Cano v. State, 846
S.W.2d 525, 527 (Tex. App.-Corpus Christi 1993, no pet.) (holding that the request to
withdraw the defendant's plea made almost four weeks after the case was taken under
advisement came too late). 

 Appellant does not dispute that the cause had been taken under advisement when
she sought to withdraw her plea. Consequently, the decision to grant or deny the request
lay in the trial court's discretion. And, given appellant's two-month delay in making the
request, the trial court did not abuse its discretion in denying it.


 Issue Two - Admissibility of Exhibit

 Next, appellant contends that the trial court erred in admitting into evidence, during
the punishment phase, State's Exhibit 1(b). It consisted of over seven grams of cocaine
found in a search of appellant's residence. Appellant believed the exhibit to be
inadmissible because the State failed to prove the requisite chain of custody. Furthermore,
it allegedly did so by neglecting to have the officer who acquired the cocaine at appellant's
home identify it. We overrule the issue. 

 Texas Rule of Evidence 901(a) states that the requirement of authentication or
identification "is satisfied by evidence sufficient to support a finding that the matter in
question is what its proponent claims." And, this can be done through "testimony that a
matter is what it is claimed to be." Tex. R. Evid. 901(b)(1). 

 The record before us illustrates that the officer who originally found or seized the
cocaine at issue did not testify or otherwise authenticate the substance prior to its
admission into evidence. Nonetheless, the officer who conducted the initial buy from
appellant at her home, who acquired 2.6 ounces of the same substance from her, and
whose purchase culminated in the search of the location did testify. Furthermore, when
asked if he recognized both the 2.6 ounces he acquired (State's Exhibit 1(a)) as well as the
seven comprising Exhibit 1(b), he replied: 

 I had packaged the narcotics. It was the crack cocaine that I had
purchased and that was also found later after the search of the residence
had been conducted. 


Then, he stated that he forwarded the exhibits "to the DPS laboratory" for analysis. (1) No
one objected to this testimony; thus, it was admissible for all purposes. See Poindexter v.
State, 153 S.W.3d 402, 406-07 (Tex. Crim. App. 2005). Given this uncontradicted
testimony, evidence appears of record sufficient to support a finding that the contents of
Exhibit 1(b) were what its proponents claimed it to be, i.e. cocaine within the possession
of appellant. Thus, we find no error in the admission of the exhibit.

 Having overruled each issue, we affirm the judgment of the trial court.


 Brian Quinn 

 Chief Justice

 

Do not publish. 

 

1. The State mistakenly argues that the officer said he "received the crack cocaine from an officer while
at the Appellant's residence." Indeed, his testimony was that he left with only the 2.6 ounces he personally
acquired from appellant.


other to testify. She explained that C.J.F. had been in her home for 18 months, and she
described him as "[a] happy little boy. Always smiling." The foster mother testified that
she and her husband hoped to adopt C.J.F. if Brenda's and Nathan's parental rights were
terminated. 

 The vast majority of the Department's case revolved around the death of N.T. 
Rodney Tucay, the medical examiner who performed the autopsy, testified that N.T., who
was not quite two and a half years old at the time of his death, died of a "blunt force injury
to the head." Specifically, Dr. Tucay averred that N.T. suffered at least 37 blunt force
injuries to his body, with 19 of those occurring on his head. The latter included "injuries
of the deep skull tissue as well as [a] subdural hemorrhage and [a] hemorrhage of the front
of the brain." Also, according to Dr. Tucay, some of the injuries to N.T.'s body were "older
than others." Doctor Tucay opined that N.T.'s multiple injuries were not caused by a fall,
nor were they sustained in a "particular accident." Rather, Dr. Tucay suggested they
represented "an ongoing pattern of abuse." To illustrate the injuries about which Dr. Tucay
testified, the Department offered into evidence three photographs of N.T.'s body prior to
the autopsy. Doctor Tucay averred that "[i]f the mother would change the clothing, the
injuries [depicted in the photographs] would be seen." In addition to the testimony
regarding N.T.'s head injuries and external bruising, Dr. Tucay told the jury about his
examination of an injury to N.T.'s intestine. Doctor Tucay opined that "to create this
particular injury, this injury must have been caused by a blow to this particular area" and
the "blow would have been a big - caused by a big force" because the internal organs are
"well-protected within the body." Again, Dr. Tucay testified that the injuries to N.T.'s
intestines could not have been caused by a fall. The Department offered and the court
admitted into evidence a photograph depicting N.T.'s intestines at autopsy. 

 At the conclusion of the Department's case-in-chief, Brenda and Nathan moved for
instructed verdicts, which the court denied. Thereafter, Brenda called Carla Roddy, one
of Nathan's former girlfriends to testify. Carla had prior convictions for failure to stop and
render aid and driving while intoxicated. She told the jury that on more than one occasion
during her relationship with Nathan she was admitted to the hospital for injuries she
sustained during physical assaults by him. She claimed that he would hit her with his fist
"everywhere." And while she admitted that Nathan never abused her then one year old
daughter, Carla also told the jury that she never left the child alone with him. In fact, she
maintained that she "did not trust him around [her] daughter because he was on drugs
sometimes." Additionally, Carla asserted that she called the police on a number of
occasions after Nathan beat her, but they never charged him with anything. Carla claimed,
however, that she "put a restraining order on him." 

 Susan Bainham testified that she gave Brenda a ride home from the local grocery
store on April 22, 2001. According to Susan, Brenda, whom Susan had met earlier that
day at the store, appeared tired, but calm, on the trip to the trailer home Brenda shared
with Nathan and N.T. Upon their arrival at the trailer, Susan heard a man, whom she later
learned to be Nathan, yell for Brenda to come inside. Brenda left her groceries and
disappeared into the trailer while Susan waited in the car for Brenda to return. Almost
immediately, Susan saw Nathan run out of the trailer carrying a little boy she later learned
to be N.T. According to Susan, Brenda "was hysterical and very upset" and "[s]he just kept
saying, what happened, what happened." Susan noticed that N.T. had blood coming out
his nose and mouth and his hair was wet as if he had been bathed recently. Additionally,
Susan said, "[i]t was like his windpipe was crushed, and he had a mark on the side of his
head." She also noticed a bruise on N.T.'s chest, but when she attempted to remove the
blanket covering the child to check for bleeding, Nathan prevented her from doing so. 
Susan remarked that the mark on N.T.'s head "was the size of Nathan's hand."

 Brenda's final witness was Josh Pruitt, the Department caseworker assigned to
handle her case. Josh told the jury that, according to the family service plan developed
by the Department, Brenda was required "to inform the Department of any changes and
correspond with C.J.F. and write him letters." Josh explained that because of Brenda's
incarceration, the family service plan placed no additional requirements upon her. 
According to Josh, Brenda complied with both requirements; however, she did not initiate
contact with C.J.F. until August of 2002, when he was nearly one year old. Josh believed
that it was in C.J.F.'s best interest for Brenda's and Nathan's parental rights to be
terminated. 

 By her first issue and his fourth, Brenda and Nathan complain the evidence is
factually insufficient to support the verdict. Brenda also includes in her first issue a
challenge to the legal sufficiency of the evidence. With her fifth issue, Brenda complains
the trial court erred in denying her motion for instructed verdict because there was no
evidence to establish a jury's finding of termination of her parental rights by clear and
convincing evidence. With each issue, we disagree. 

 Initially we note that an appeal from the denial of a motion for instructed or directed
verdict is essentially a challenge to the legal sufficiency of the evidence. Fein v. R.P.H.,
Inc., 68 S.W.3d 260, 265 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). Therefore, we
address Brenda's first and fifth issues contemporaneously. The parent-child relationship
may be terminated if the parent has engaged in any of the conduct set out as grounds for
termination in the Family Code, and termination is in the child's best interest. Tex. Fam.
Code Ann. § 161.001 (Vernon 2002). Both of these elements must be established by clear
and convincing proof. Id. In a legal sufficiency review of the evidence to support an order
terminating parental rights, we look at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of fact could have formed a firm belief or
conviction that its finding was true. In re. J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). To give
appropriate deference to the factfinder's conclusions and the role of a court conducting a
legal sufficiency review, looking at the evidence in the light most favorable to the judgment
means that a reviewing court must assume the factfinder resolved disputed facts in favor
of its finding if a reasonable factfinder could do so. Id. Thus, we disregard all evidence
that a reasonable factfinder could have disbelieved or found to have been incredible. Id. 


 The standard for reviewing the factual sufficiency of termination findings is whether
the evidence is such that a reasonable jury could form a firm belief or conviction about the
truth of the Department's allegations. In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). Under
that standard, we consider whether the disputed evidence is such that a reasonable
factfinder could not have resolved the disputed evidence in favor of its finding. In re
J.F.C., 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a
reasonable factfinder could not have credited in favor of the finding is so significant that
a factfinder could not reasonably have formed a firm belief or conviction, then the evidence
is factually insufficient. Id. 

ENDANGERMENT


 As its sole ground for termination of both Brenda's and Nathan's parental rights,
the Department alleged they engaged in conduct or knowingly placed C.J.F. with persons
who engaged in conduct which endangered his physical or emotional well-being. Tex.
Fam. Code Ann. § 161.001(1)(E). Endanger means to expose to loss or injury or to
jeopardize. Texas Dept. of Human Services v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). 
While endanger means more than a threat of metaphysical injury or the possible ill effects
of a less-than-ideal family environment, it is not necessary that the conduct be directed at
the child or that the child actually suffers harm. Id. The specific danger to the child's well-being need not be established as an independent proposition, but may instead be inferred
from parental misconduct. In re S.Z.G., 2003 WL 21771759, at *6 (Tex.App.-Tyler July
31, 2003, no pet.). If a parent abuses or neglects the other parent or children, that conduct
can be used to support a finding of endangerment even against a child who was not yet
born at the time of the conduct. In the Interest of W.J.H., 111 S.W.3d 707, 716
(Tex.App.-Fort Worth 2003, pet. denied). Additionally, domestic violence, want of self-control and propensity for violence may be considered as evidence of endangerment. In
re J.I.T.P., 99 S.W.3d 841, 845 (Tex.App.-Houston [14th Dist.] 2003, no pet.). Finally, the
need for permanence is a paramount consideration for the child's present and future
physical and emotional needs. In re S.Z.G, 2003 WL 21771759, at *6. 

 In the appeal of an order terminating parental rights under section 161.001(1)(E),
we must look at the parent's conduct alone, including actions, omissions, or the parent's
failure to act. In re D.J., 100 S.W.3d 658, 662 (Tex.App.-Dallas 2003, pet. filed). It is
inconsequential that the parental conduct occurred before or after the child's birth. In re
U.P., 105 S.W.3d 222, 229 (Tex.App.-Houston [14th Dist.] 2003, pet. filed). Indeed, the
law does not require that the child be a victim of abusive conduct before the Department
can involuntarily terminate a parent's rights to the child. Dallas Cty. Child Prot. Serv. v.
Bowling, 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no pet.). Rather, if the evidence
shows a course of conduct which has the effect of endangering the emotional well-being
of the child, a finding under section 161.001(1)(E) is supportable. In the Interest of B.B.,
971 S.W.2d 160, 169 (Tex.App.-Beaumont 1998, pet. denied)(citing section 15.02(1)(E),
the predecessor to the current statute). 

 Brenda claims "the only evidence presented which will support the decision to
terminate . . . is that [she] had a prior child [N.T.] allegedly harmed and killed by Nathan
Felder, who is the father of the child, [C.J.F.]; and that [she] has been in jail and is unable
to care for [C.J.F.]." Similarly, Nathan claims that other than his criminal background and
the negative inferences that could be drawn from the invocation of his Fifth Amendment
right against self incrimination, the only other evidence the Department established to
prove its ground for termination was that (1) he was with N.T. at or near the time of the
injuries that caused N.T.'s death; (2) he possibly knew about previous injuries to N.T. and
did nothing about them; and (3) he was abusive to a former girlfriend. Our review of the
record with respect to both parents, however, leads us to the conclusion that there is
additional legally and factually sufficient evidence to support the jury's recommendation
on the issue.

 Brenda's father considered her to be a drug addict who would "leave her child in the
middle of the night and just say, you know, that's the way it is." He concluded that, based
upon his observations of Brenda with her other four children, she would be unable to care
for C.J.F. Indeed, the evidence revealed that none of Brenda's five children lived with her. 
And while Brenda admitted she began using drugs at the age of 13, she refused to answer
a host of other questions about her drug use and its effects on her family and her ability
to parent. 

 From Carla, the jury learned that Nathan was physically abusive, and that she did
not trust him with her child because of his propensity to do drugs. Susan told the jury that
one of the many bruises on N.T.'s head was the same size and shape as Nathan's hand. 
Nathan told the jury about his violent criminal background which resulted in his
incarceration for all but four years of his adult life. He also admitted that he and Brenda
were the only people in the home with N.T. Like Brenda, however, Nathan invoked his
Fifth Amendment right against self-incrimination numerous times in response to questions
about his and Brenda's drug use, his lack of self control with N.T., and his actions on the
day of N.T.'s death. 

 A jury may draw an adverse inference against a party who pleads the Fifth
Amendment. Texas Capital Securities, Inc. v. Sandefer, 58 S.W.3d 760 779
(Tex.App.-Houston [1st Dist.] 2001, pet. denied)(citing Baxter v. Pamigiano, 425 U.S. 308,
318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810, 821, (1976)). Refusal to answer questions by
asserting the privilege is relevant evidence from which the finder of fact in a civil action
may draw whatever inference is reasonable under the circumstances. Lozano v. Lozano,
983 S.W.2d 787, 791 (Tex.App.-Houston [14th Dist.] 1998)(also citing Baxter, 425 U.S. at
318), rev'd on other grounds, 52 S.W.3d 141 (Tex. 2001). (2) Thus, a jury may have drawn
adverse inferences from Nathan and Brenda's refusal to answer the multitude of questions
propounded to them by the Department and C.J.F.'s ad litem. 

 Viewing the evidence in the light most favorable to the finding, a reasonable
factfinder could have concluded that Brenda was a drug addict who abused drugs while
pregnant and whose drug use interfered with her ability to parent her children; that Brenda
was unable to parent any of her other four children; that Nathan physically abused Brenda;
that Nathan physically abused, and ultimately killed, N.T.; that Nathan's course of conduct
with N.T. indicated he would pose a similar threat to C.J.F.; that Brenda left N.T. with
Nathan knowing that Nathan was physically abusing him; that she would be similarly
unprotective of C.J.F.; and that Brenda and Nathan have been in jail for all of C.J.F.'s life
and have no plans for raising him. Nathan's abuse of Brenda alone can suffice to support
termination of his parental rights. Lucas v. Texas Dept. of Protective and Regulatory
Services, 949 S.W.2d 500, 503 (Tex.App.-Waco 1997, writ denied). Likewise, the singular
fact that Brenda allowed N.T. to remain unattended in the company of one she knew had
abused him in the past provides a basis for termination of her parental rights to C.J.F.
under section (E). See In re J.M.C.A., 31 S.W.3d 692, 698 (Tex.App.-Houston [1st Dist.]
2000, no pet.). Moreover, while Brenda's and Nathan's current incarceration, standing
alone, does not constitute engaging in conduct which endangers the emotional or physical
well-being of the child, it is a fact properly considered on the issue of endangering. In re
D.M., 58 S.W.3d 801, 812 (Tex.App.-Fort Worth 2001, no pet.). Here, Brenda's and
Nathan's imprisonment merely contributes to the jury's finding. Therefore, we conclude
the evidence, viewed in the light most favorable to the finding, is sufficiently clear and
convincing that a reasonable trier of fact could have formed a belief or conviction to the
truth of the allegations that Brenda and Nathan engaged in conduct which jeopardizes the
well-being of C.J.F. 

 Although Brenda testified that she will protect C.J.F. from violent situations, the jury
could have chosen to disbelieve her and to determine, instead, that her course of conduct
relating to N.T. belied her testimony. Furthermore, while we do not question Brenda's love
for her children and her horror at N.T.'s death, the jury was entitled to conclude that those
emotions were insufficient to provide for C.J.F.'s needs. Additionally, while Nathan
attempted to establish, through his cross-examination of Dr. Tucay, that many of N.T.'s
injuries were caused by accidents and were "non-serious," the jury could have chosen to
believe Dr. Tucay's assessment to the contrary. Thus, although there is some disputed
evidence, we find that it was not so significant that a reasonable trier of fact could not have
reconciled it in favor of its finding and formed a firm belief or conviction that Brenda and
Nathan engaged in conduct which endangers C.J.F.'s physical or emotional well-being.

BEST INTEREST OF THE CHILD


 In determining the best interest of the child, a number of factors have been
considered including: (1) the desires of the child; (2) the emotional and physical needs of
the child now and in the future; (3) the emotional and physical danger to the child now and
in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals; (6) the plans for the child by these individuals; (7) the
stability of the home; (8) the acts or omissions of the parent which may indicate that the
existing parent-child relationship is not a proper one; and (9) any excuse for the acts or
omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976). These
factors are not exhaustive; some listed factors may be inapplicable to some cases, while
other factors not on the list may also be considered when appropriate. In re C.H., 89
S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a
particular case to support a finding that termination is in the best interest of the child. Id. 
In contrast, the presence of scant evidence relevant to each Holley factor will not support
such a finding. Id. Evidence that proves one or more statutory grounds for termination
may also constitute evidence illustrating that termination is in the child's best interest. Id.
at 28. The Department simply must have presented enough evidence from which the
factfinder could reasonably have formed a firm conviction or belief that the child's best
interest warranted termination. In re D.S.A., 113 S.W.2d 567, 574 (Tex.App.-Amarillo
2003, no pet.).

 Here, there is evidence that (1) Brenda is a drug addict; (2) she used drugs while
pregnant with C.J.F.; (3) she has never raised any of her five children into puberty; (4) her
own father believes it is in C.J.F.'s best interest that her parental rights be terminated; (5)
she failed to protect N.T. from abuse by Nathan; (6) she has been in jail all of C.J.F.'s life;
(7) she has no plan for caring for C.J.F. while she is in jail; and (8) the foster family with
whom C.J.F. has lived nearly all of his life has never "had any problems in [their] home
criminally," has never been "investigated for abuse of a child," and has agreed to provide
C.J.F. with a loving and safe environment if allowed to adopt him. Additionally, there is
evidence that Nathan (1) is a career criminal; (2) is physically abusive; (3) is a drug seller
and addict; (4) physically abused, and ultimately killed, another child; and (5) has been in
jail for all of C.J.F.'s life and has no plan for raising him. We conclude the preceding
evidence, viewed in the light most favorable to the finding, is sufficiently clear and
convincing that a reasonable trier of fact could have formed a firm belief or conviction that
terminating Brenda's rights was in the best interest of C.J.F. We acknowledge, as Brenda
asserts, that there is a "strong presumption that the best interest of a minor is usually
served by keeping custody in the natural parents." Matter of R.W., 545 S.W.2d 573, 581
(Tex.App.-Houston [1st Dist.] 1976, no writ). However, because the Department
successfully rebutted that presumption, there remains no evidence that is so significant
that a reasonable trier of fact could not have reconciled the evidence in favor of its finding
that termination of Brenda's and Nathan's parental rights in C.J.F. was in his best interest. 
In the Interest of J.I.T.P., 99 S.W.3d at 846. In short, the evidence is legally and factually
sufficient to establish that termination of Brenda's and Nathan's parental rights is in
C.J.F.'s best interest. Brenda's first and fifth issues and Nathan's fourth are overruled.

 By their second issue, Brenda and Nathan complain the trial court erred in refusing
to submit in its charge to the jury the following instruction: "Mere imprisonment will not,
standing alone, constitute engaging in conduct which endangers the emotional or physical
well-being of a child." We disagree. Explanatory instructions should be submitted when,
in the sole discretion of the trial court, they help the jurors understand the meaning and
effect of the law and the presumptions the law creates. Ishin Speed Sport, Inc. v.
Rutherford, 933 S.W.2d 343, 349 (Tex.App.-Fort Worth 1996, no writ). A trial court's
refusal to submit an explanatory instruction will not be overturned on appeal unless the
court abused its discretion. Magro v. Ragsdale Bros. Inc., 721 S.W.2d 832, 836 (Tex.
1986). No abuse of discretion is shown unless the requested instructions were so
necessary to enable the jury to render a proper verdict that the court's refusal probably did
cause the rendition of an improper verdict. Harris County v. Bruyneel, 787 S.W.2d 92, 94
(Tex.App.-Houston [14th Dist.] 1990, no writ). Here, while Brenda's and Nathan's
requested instruction is an accurate reflection of the law, it was not necessary to enable
the jury to render a proper verdict. The Department advanced a number of theories to
persuade the jury that there were sufficient grounds upon which to terminate Brenda's and
Nathan's parental rights. The fact that Brenda and Nathan had been incarcerated for all
of C.J.F.'s life was but one of those theories. Indeed, the Department relied more heavily
upon other theories, not the least of which were that Nathan abused, and ultimately killed
another child, and that Brenda knew about but failed to protect that child from the abuse. 
Thus, the trial court did not abuse its discretion in refusing to give the requested
instruction. Brenda's and Nathan's second issue is overruled. 

 Brenda and Nathan contend by their third issue that the trial court erred in
submitting the following instruction to the jury: Endanger means to expose to loss or injury;
to jeopardize; it is not necessary that the conduct be directed at the child or that the child
actually suffer injury. We disagree. The standard for review of a jury charge is abuse of
discretion, and it occurs only when the trial court acts without reference to any guiding
principle. Texas Dept. of Human Services v. E.B., 802 S.W.2d 647, 649 (Tex. 1990). A
trial court must submit "such instructions and definitions as shall be proper to enable the
jury to render a verdict." Tex. R. Civ. P. 277. This rule affords the trial court considerable
discretion in deciding what instructions are necessary and proper in submitting issues to
the jury. State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 451 (Tex. 1997). For an
instruction to be proper, it must (1) assist the jury, (2) accurately state the law, and (3) find
support in the pleadings and the evidence. In re K.M.B., 91 S.W.3d 18, 27 (Tex.App.-Fort
Worth 2002, no pet.). 

 Here, Brenda and Nathan were in jail at the time of C.J.F.'s birth and have never
had physical custody of him. To prove its case for termination of her parental rights in
C.J.F. then the Department relied in large part upon Brenda's conduct with her other
children, specifically, her failure to protect N.T. from abuse by Nathan. Similarly, the
Department attempted to show that Nathan's course of conduct with N.T. placed C.J.F. at
risk for abuse. The instruction given by the trial court, therefore, assisted the jury in
reaching its verdict and accurately stated the definition of endanger as developed by the
Texas Supreme Court. See Boyd, 727 S.W.2d at 533. Given the broad latitude that trial
courts have in giving jury instructions, we cannot say that the trial court acted without any
regard to guiding principles in deciding what issues were necessary and proper. In re
K.M.B., 91 S.W.3d at 27. Brenda's and Nathan's third issue is overruled.

 By her fourth issue and his first, Brenda and Nathan contend the trial court erred
in admitting into evidence four autopsy photographs of N.T. because they were not
relevant, and their probative value was substantially outweighed by the danger of unfair
prejudice to her under Rule 403 of the Rules of Evidence. We disagree. We review a trial
court's admission or exclusion of evidence for an abuse of discretion. In re J.W., 113
S.W.3d 605, 612 (Tex.App.-Dallas, 2003, no pet.)(citing City of Brownsville v. Alvarado,
897 S.W.2d 750, 753 (Tex. 1995)). Because the best interest of the child must be the
court's primary consideration in a suit affecting the parent-child relationship, Rule 403 is
an extraordinary remedy that must be used sparingly. Id. 

 Visual or demonstrative evidence is admissible if it tends to resolve a relevant
issue, as long as its probative value substantially outweighs the danger of unfair prejudice. 
Tex. R. Evid. 403; In re K.M.B., 91 S.W.3d at 29. Evidence is relevant if it has the
tendency to make the existence of any fact that is of consequence to the determination of
the action more probable or less probable than it would be without the evidence. Tex. R.
Evid. 401. To properly apply Rule 403 to relevant evidence, the trial court must balance
and weigh the probative effect of the evidence against its potential for unfair prejudice or
confusion. LSR Joint Venture No. 2 v. Callewart, 837 S.W.2d 693, 698 (Tex.App.-Dallas
1992, writ denied). In weighing the probative value of the evidence against the danger of
unfair prejudice, the court must first examine the necessity for and probative effect of the
evidence. Id. The fact that photographs are gruesome does not render them inadmissible. 
Fibreboard Corp v. Pool, 813 S.W.2d 658, 671 (Tex.App.-Texarkana 1991, writ denied),
cert. denied, 508 U.S. 909, 113 S.Ct. 2339, 124 L.Ed.2d (1993). 

 As we have noted a number of times, the crux of the Department's case for
termination of Brenda's parental rights in C.J.F. was that she was aware that Nathan was
abusing N.T. but failed to do anything about it, and that she would pose a similar risk to
C.J.F. if afforded the opportunity. Likewise, one of the Department's theories for
termination of Nathan's parental rights in C.J.F. was that he abused over time, and
ultimately killed, another child, N.T. According to Dr. Tucay, exhibits 2, 3, and 4
demonstrated that N.T. suffered an ongoing pattern of abuse-a pattern of abuse that
would have been noticed by Brenda when she bathed N.T. or changed his clothes. The
Department offered exhibit 5, the photograph of N.T.'s hemorrhaged intestine, to refute any
testimony by Brenda or Nathan that the injury was caused by an accidental fall and to
illustrate the severity of the abuse. Thus, the trial court could reasonably have concluded
that the photographs were relevant to whether N.T. was being physically abused, whether
Brenda failed to protect N.T. from the abuse, and whether they would, similarly endanger
C.J.F. by that course of conduct. (3) Additionally, the photographs aided the jury in
understanding Dr. Tucay's testimony about how he arrived at his conclusions. The trial
court also could have reasonably concluded that the probative value of the autopsy
photographs was not substantially outweighed by the danger of unfair prejudice. 
Furthermore, assuming arguendo the trial court erred in admitting the photographs, Brenda
and Nathan have failed to demonstrate that a substantial right of theirs was affected, and
that the error probably caused the rendition of an improper judgment. Tex. R. App. P.
44.1(a); Alvarado, 897 S.W.2d at 753. Brenda's fourth and Nathan's first issues are
overruled.

 Accordingly, the judgment of the trial court is affirmed.

 Don H. Reavis

 Justice
1. U.S. Const. amend. V.
2. At least one appellate court has applied the Baxter holding in parental termination
cases. See In re P.A.O., M.P.O., and S.L.O., Minor Children, 2001 WL 175620
(Tex.App.-El Paso February 22, 2001, pet. denied)(not designated for publication). 
3. The Dallas Court of Appeals case attached as an appendix to Brenda's brief lends
additional support to our resolution of this issue. Williams v. Texas Department of
Protective and Regulatory Services, 1998 WL 423474 (Tex.App-Dallas July 29, 1998, writ
denied)(not designated for publication). In that case, as in this one, the autopsy
photographs were relevant and admissible to establish the mother's knowledge of abuse
to her child by another adult.