**Trevena Shaye Russell BROWN, Appellant,**

v.

**Paul Wesley RUSSELL, Appellee.**

**No. 2–85–150–CV.**

Court of Appeals of Texas, Fort Worth.

Feb. 19, 1986.

Watson, Ice & McGee, Edgar O. Coble, Fort Worth, for appellant.

Michael R. Rake, Hurst, for appellee.

Before FENDER, C.J., and ASHWORTH and HOPKINS, JJ.

## OPINION

FENDER, Chief Justice.

This is an appeal from an order changing the managing conservatorship of a 3-year old female child from the mother, Trevena Brown, appellant, to the father, Paul Russell, appellee. Trial was to a jury beginning March 27, 1985.

We reverse and remand.

Trevena and Paul were divorced in January, 1983 and Paul agreed that Trevena would be named managing conservator. The child, Trena, was three years old at the time. Trevena and Trena moved in with Trevena's parents during the separation and divorce and until about four weeks after the divorce. Trevena then moved in with Jerry Brown. Trena continued to sleep at her grandparents' house. Trevena had two children with Jerry Brown, one born before they were married on January 9, 1984. Trevena stated that these two children have always slept at Trevena and Jerry's house while Trena sleeps at her grandparents' house. She stated that she sees Trena daily or almost every day.

From July of 1984 until and at the time of trial, Trevena lived next door to her parents and on the same block as other family members on Glen Hills Road in Richland Hills.

Trena is taken to day care by Trevena's mother each day and then is picked up by Trevena's father and taken to Trevena's

house until it is time for her to go to bed. Trevena testified that Trena expressed a desire to stay and sleep at her grandparents' house.

Appellee sought to change the designation of the managing conservator by proving that each of the three statutory requirements had been met: 1) that the circumstances of the child or party affected by an order or decree have materially and substantially changed since entry of the order or decree; 2) that retention of the present managing conservator would be injurious to the welfare of the child; and 3) that the appointment of the new managing conservator would be a positive improvement for the child. *See* TEX.FAM.CODE ANN. sec. 14.08(c)(1)(A–C) (Vernon Supp. 1986). Appellee contends that there has been a change in circumstances because appellant left Trena with her parents and moved in with her boyfriend; appellant remarried, had two children, and is now separated from her second husband; Trena spends most of her time with her grandparents and not with appellant. Appellee contends that the retention of appellant as managing conservator would be injurious to the welfare of the child because the child had limited contact with appellant; appellant had denied appellee his court ordered visitation with the child and had attempted to harm the relationship between the child and appellee; that appellant put Trena in a day care center five days a week even when, at times, she was not working and when she kept the other two children at home. Appellee contends that his own appointment as managing conservator would be a positive improvement for the child because he would work with Trevena and her family for Trena's good; he would tell Trena that her mother loves her; that he would provide a better parental environment for the child in both quantity and quality of time; that the child would be under the care of and living in the household of a parent; and that the child would have a good relationship with both her mother and father.

A court appointed psychologist, Dr. Beatrice Matheny, testified that the bonding between Trena and her mother and her mother's family is fairly strong; that, in her opinion, Trena should remain in the custody of her mother, but that she should be given a great deal of access to her father and that she needed to know who her father was; that joint custody might be a viable solution; that no one had degraded Paul in front of Trena; and that appellee had told her that he worked during the day and would leave Trena with his mother and later in some kind of day care until he got home from work at night.

Appellee stated that he has never filed a contempt motion to enforce visitation.

The jury returned all four special issues in favor of a change of custody. Each issue contained an element of the three-prong test outlined *supra* except for special issue four which asked whether there had been a material change in circumstances concerning support of the child.

While a review of the record reflects that there may be some merit to appellant's points of error claiming no evidence or insufficient evidence to support the three-prong test outlined *supra,* we need not address these points because we reverse on other grounds. In appellant's seventh point of error, she contends that the district court's examination, before the jury, of Dr. Matheny criticizing the failure to procure appellant's husband for psychological testing was a prejudicial comment on the weight of the evidence that unfairly and incurably "cast appellant as hiding her husband from being tested by the psychologist." The record reflects that the following occurred at trial:

"MR. TANNER [Appellant's counsel]: Objection, Your Honor. She has never talked to Jerry or interviewed Jerry in any way.

"THE COURT: You are absolutely correct. She hasn't. Let's get into that.

EXAMINATION

BY THE COURT:

"Q. What significance do you think there is, first, to clarify your testimony and from a psychological standpoint—and when you say psychological, as far as we are concerned, what is best for the child, not what's best for either parent.

"Was it right that the mother registered this child in the stepfather's name, instead of the child's natural father?

"A. I think that that is involved in her—in the child's concept—forming a concept of—

"Q. Was it right for the child? Was it in the child's best interest?

"A. No.

"Q. All right. With reference to the child continually calling her stepfather the father, and not her real father, and the mother, apparently, not doing anything to change that, was this right as far as the child is concerned?

"A. The problem in that is that I don't find a problem in her calling Jerry her father as long as she knew that Paul was also her father. That's what I find the problem is because I find a lot of children, when there is a remarriage, will call the new father the father, but they also can verbalize to me about their real father. They know who their real father is, so that's how I see the problem.

"Q. It is a problem then with the child?

"A. That she does not know who her real father is. Definitely.

"Q. Do you think this could have been corrected by the mother?

"A. Oh, yes.

"Q. All right. What do you think of the fact that here we have the stepfather knowing that we have this case and how important it is to do what is best for the child, and in your report you indicate that the stepfather was unable to come in for an office interview? The reason given was that he was unable to take off from work. Does that show any concern of the stepfather for that child?

"A. I think that was someone else's report. I didn't know that he was going to come in.

"Q. All right. You didn't get—did you ask to talk to the stepfather?

"A. No. The stepfather never came in.

"Q. Did you invite him?

"A. No, I didn't. The only—as far as I knew, when the original evaluation was made and the attorneys called me to ask me if I would be willing to do it, was that there would be an evaluation of the mother, the father and the daughter. That's all I knew.

"Q. But also since you knew the closeness of the stepfather, wouldn't it be appropriate to get the complete picture and see how it—

"A. Yes.

"Q. —he interreacted?

"A. It would have been beneficial.

"Q. And the stepfather made no effort to make himself available?

"A. No, he did not make an effort. I—I don't know what the original understanding on it was, but he did not contact me.

"MR. TANNER: Your Honor, I might add it was our understanding that he was not to be made available.

"THE COURT: Are you testifying? Are you going to testify? Are you going to testify?

"MR. TANNER: I hope not.

"THE COURT: Okay.

BY THE COURT:

"Q. Considering the mother's relationship with Jerry, the stepfather, that goes way back and the fact that the child was not living in her home with her, but living in her parents' home and the fact that the child was not comfortable living in the home with the mother and the stepfather, at least staying overnight, and considering the fact that there's been some difference between the mother and the stepfather because the mother is seeking to retain custo-

dy, and there's been no showing of support of the stepfather in her pursuit of this—

"A. Okay. Okay.

"Q. *—what does this show you, also in view of the fact that we have had testimony here that when the mother refers to the children of her marriage with Jerry, the stepfather, she says, "My children"? In other words, it doesn't include the child that's involved in this lawsuit. Does this indicate anything of a priority that the mother may have as between her boyfriend or former boyfriend —her* present husband Jerry and the child that we have involved in this particular case? In other words, which comes first from the mother's concern? [Emphasis added.]

"A. I don't know that I could—that I could give a real definite opinion on that. I—

"Q. Well, *is it normal for the mother to be that more closely and emotionally attached to a stepfather, rather than a child of a prior marriage?* [Emphasis added.]

"A. To the stepfather, rather than a child of a prior marriage?

"Q. Yeah. In other words, there is one that takes paramount position or priority.

"A. Well, with mothers, I should say most of the time, the children take priority over a second relationship or any other relationship. I have had many, many mothers tell me that they would not go into another relationship if there was not a good relationship between their children and the father.

"Q. All right. That being the case, would you say that's the situation here?

"A. I am really not sure on that point, Your Honor. The one aspect to it that I had some difficulty with was the fact that Trevena told me that she put Trena in a day care center during the day and did not put the two younger children in a day care center, and I can understand having a child go through enrichment programs, and I see nothing wrong with having a child go through enrichment programs, but at the age that Trena is, I think it's a little bit young for a nonworking mother to keep a child in a day care program like that five days a week.

"Q. Do you think it's right that all her children were not treated the same?

"A. They weren't in that case, and I think it's possible that Trena could begin to feel that she was pushed off while the other two children were kept at home. I don't know how—I don't know if that's developing. I think it's possible.

"Q. Well, could this create any psychological problems with the child?

"A. In the child, yes, it could."

The general rule is that a presiding judge at a trial must conduct it in a fair and impartial manner and refrain from making unnecessary comments or remarks during the course of trial which may tend to result in prejudice to a litigant, or is calculated to influence the minds of the jury. *Crawford Chevrolet, Inc. v. McLarty,* 519 S.W.2d 656, 664 (Tex.Civ.App.—Amarillo 1975, no writ). However, a judgment will generally not be reversed on the basis of improper comments or conduct on the part of a trial judge except where they are shown to be prejudicial. *See id.* A determination of whether the error probably did cause the rendition of an improper judgment by influencing the jury to return a verdict it probably would not have otherwise returned is to be made from an examination of the record as a whole. *Walker v. Texas Employers' Insurance Association,* 155 Tex. 617, 291 S.W.2d 298, 301 (1956).

The court's comments implied that Jerry Brown was bad for Trena, that he did not care, and that appellant had less concern for Trena than she did for her husband. A review of the record reveals that the trial court had no apparent basis for his conclusions that appellant was "more closely and emotionally attached" to her husband than to her child and that her husband comes before the child in her priorities. The jury might reasonably have inferred from the remarks made that the trial judge's assertions were true even

though the assertions were made without factual support. Appellee contends that any comment by the judge was merely incidental and was not of such nature as to prejudice appellant. Appellee further contends that the comments were not reasonably calculated to cause nor did they probably cause the rendition of an improper judgment because a pretrial order was introduced into evidence which stated which parties were to be examined and because the psychologist testified that the stepfather was not to be tested. Although these facts may have been helpful to cure the prejudice and harm from the trial court's comment that "the stepfather made no effort to make himself available [to the psychologist]", we do not see where this lessens the prejudice and harm to appellant from the court's comments concerning appellant's "priority" between Jerry and Trena and the court's conclusion that "the child was not living in her [appellant's] home with her, but living in her parents' home and the fact that the child was not comfortable living in the home with [appellant] and the stepfather, ...". These remarks were of such a nature that even an instruction could not cure the harm and so it was not necessary to request an instruc-tion. *Southland Greyhound Lines v. Matthews,* 74 S.W.2d 713, 715 (Tex.Civ.App.—Beaumont 1934, writ dism'd); *cf. Burgess v. Sylvester,* 177 S.W.2d 271, 274 (Tex.Civ. App.—Amarillo), *aff'd,* 143 Tex. 25, 182 S.W.2d 358 (1944). Without further discussion and analysis, we hold that the comments of the trial judge herein complained of were prejudicially erroneous to the rights of appellant and were such as to require reversal of the judgment appealed from. *See Texas Employers Ins. Ass'n v. Hale,* 167 S.W.2d 575, 577 (Tex.Civ.App.—Waco 1942, writ ref'd); TEX.R.CIV.P. 434. Appellant's seventh point of error is sustained. In view of our disposition of this point of error which requires reversal and remand for a new trial, we deem it unnecessary to address appellant's remaining eleven points of error.

The judgment is reversed and the cause remanded for new trial.