Wallingford 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-93-00060-CV







Cheryl Sue Wallingford, Appellant



v.



Mutual Life Insurance Company of New York d/b/a Centennial Towers, Property

Management Systems, Inc., and James Kelley d/b/a Ranger Construction Co., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. 465,318, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING








 Appellant Cheryl Sue Wallingford sued Mutual Life Insurance Company of New
York d/b/a Centennial Towers, Property Management Systems, Inc. and James Kelley d/b/a
Ranger Construction Company, appellees, for personal injuries she sustained while employed as
a receptionist by the Association of Texas Professional Educators ("ATPE"). After a jury trial
in which the jury found no negligence or causation on the part of any of the appellees, the trial
court rendered a take-nothing judgment against Wallingford. Wallingford appeals from this
judgment, raising eight points of error complaining of the trial court's jury charge; the trial
court's error in overruling her motion for continuance, her motion for judgment notwithstanding
the verdict ("JNOV"), and her motion for new trial; the trial court's alleged bias and prejudice;
and various evidentiary rulings. We will affirm the trial court's judgment.



BACKGROUND


 In January 1988, ATPE hired Wallingford as a receptionist. At that time, ATPE's
offices were located in Suite 250 of Centennial Towers. During June and July of 1988, ATPE
contracted with Ranger Construction Company to remodel office space adjacent to the reception
area occupied by Wallingford. At the time, appellee Mutual Life Insurance Company of New
York ("MONY") owned the building and Property Management Systems, Inc. ("PMS") managed
the property. Wallingford claims that as a result of this renovation project, she suffered serious
and permanent injuries that forced her to quit work on July 8, 1988. She sued appellees, alleging
their negligence and gross negligence proximately caused her injuries. According to Wallingford,
Centennial Towers had a substandard heating, ventilation, and air conditioning ("HVAC") system,
which exacerbated the effect of the hazardous, toxic fumes given off by products used in the
renovation, thus causing her injuries. After a jury trial, the jury found no negligence or causation
on the part of any of the appellees, and the trial court rendered a take-nothing judgment against
Wallingford. Wallingford appeals from this judgment.



DISCUSSION


A.  The Jury Charge

 Wallingford complains in her first two points of error that the trial court erred in
submitting the case to the jury under a general negligence charge instead of a premises liability
charge. The second question submitted to the jury asked:



 Did the negligence, if any, of the persons named below proximately cause the
injury to Cheryl Wallingford?


. . .


Answer "Yes" or "No" for each of the following:


a. Mutual Life Insurance Company of New York

 d/b/a Centennial Towers 


b. Property Management Systems, Inc. 


c. James Kelley d/b/a Ranger Construction 


d. Cheryl Wallingford 



Wallingford does not argue that this charge was improper for a general negligence claim. Rather,
she asserts that this broad form general negligence submission was inappropriate in the context
of a premises liability claim. We will assume arguendo that Wallingford's claim was in fact a
premises liability claim. (1) 

 Wallingford contends that the trial court should have submitted instructions to the
jury based on the four elements required by the Texas Supreme Court in Corbin v. Safeway
Stores, Inc., 648 S.W.2d 292 (Tex. 1983), to establish a premises liability claim:



(1) Actual or constructive knowledge of some condition on the premises by the
owner/operator; 


(2) The condition posed an unreasonable risk of harm;

 

(3) The owner/operator did not exercise reasonable care to reduce or to eliminate
the risk; and 


(4) The owner/operator's failure to use such care proximately caused the
plaintiff's injuries.


Id. at 296. In Keetch v. Kroger Co., 845 S.W.2d 262 (Tex. 1992), the supreme court specifically
identified the appropriate jury charge in the context of a premises liability claim. The court stated
that a general negligence question such as Pattern Jury Charge 66.04 "is a correct broad form
premises liability question." Id. at 266; see also 3 State Bar of Texas, Texas Pattern Jury Charge
66.04 (1990). The court stressed, however, that "appropriate instructions in a premises liability
case must incorporate the four Corbin elements." Keetch, 845 S.W.2d at 266. In the present
case, jury question two tracked Pattern Jury Charge 66.04 exactly. However, no instructions
were submitted incorporating the four Corbin elements. Accordingly, the charge was improper
for a premises liability claim.

 In order to preserve error on appeal, an appellant must comply with the relevant
Texas Rules of Civil Procedure. Where a court has omitted an instruction from the charge, Rule
278 requires that in order to preserve error for appellate review, the complaining party must
request the desired instruction in writing and in substantially correct form. Tex. R. Civ. P. 278. 
Thus, a trial court's failure to submit an instruction shall not be a ground for reversal of a
judgment unless the instruction was tendered in substantially correct wording. Placencio v. Allied
Indus. Int'l, Inc., 724 S.W.2d 20, 21 (Tex. 1987). The supreme court has defined the meaning
of "substantially correct":



[S]ubstantially correct . . . does not mean that it must be absolutely certain, nor
does it mean one that is merely sufficient to call the matter to the attention of the
court will suffice. It means one that in substance and in the main is correct, and
that is not affirmatively incorrect.



Id. (citation omitted); see also Collins v. Beste, 840 S.W.2d 788, 791 (Tex. App.--Fort Worth
1992, writ denied). 

 Wallingford submitted a written request for the following instruction in connection
with jury question two:



 You are instructed that the owner and/or occupier and/or possessor of a
premises owes a duty to all invitees upon the premises to exercise reasonable care
for their safety while on the premises. You are further instructed that the
owner/occupier/possessor of a premises includes the titled owner of such premises,
the manager of such premises and such entities as a contractor who is occupying
a portion of such premises for the purposes of construction. You are further
instructed that the term "invitee" includes such persons and entities as tenants and
their employees. The standard of care for such owner/occupier
/manager/contractor is to exercise that degree of care which an ordinarily prudent
owner/occupier/manager/contractor would exercise under all the pertinent
circumstances and, in the light of what such owner/occupier/manager/contractor
knew or should have known about the risks involved with regard to that particular
activity in question. Such duty of the owner/occupier/manager /contractor toward
invitees also includes, but is not limited to, the duty to inspect the premises to
discover dangerous conditions, to provide protective measures and/or devices in
order to prevent injury to invitees, and to give a warning to invitees adequate to
enable them to avoid harm or otherwise protect themselves against potential harm.



(Emphasis added.) This instruction is not in substantially correct form. 

 A request is affirmatively incorrect if it assumes a material controverted fact. 
Placencio, 724 S.W.2d at 21; Collins, 840 S.W.2d at 791. Wallingford's requested instruction
expands the definition of "owner/occupier" to "owner/occupier/possessor" and then asserts that
"owner/occupier/possessor" includes the manager of the premises and "such entities as a
contractor who is occupying a portion of the premises for the purposes of construction." This
proposed instruction fails to point out that a contractor on the premises must be in control of the
premises in order to be charged with the same duty as an owner. See Wal-mart Stores, Inc. v.
Alexander, 868 S.W.2d 322, 324 (Tex. 1993) ("The phrase `occupier of premises,' as interpreted
by Texas courts, means the party in control of premises.") (quoting Howe v. Kroger Co., 598
S.W.2d 929, 930 (Tex. Civ. App.--Dallas 1980, no writ)); Redinger v. Living, Inc., 689 S.W.2d
415, 417 (Tex. 1985) (stating that contractor "who is in control of the premises" is charged with
same duty as owner or occupier). 

 The contractor, James Kelley, testified that Wallingford's employer, ATPE,
supervised the renovation project and thus was in control of the project. In addition, ATPE's
attorney, Rebecca McLamore, testified that ATPE made the decision not to relocate during the
renovation due to cost and lack of space availability. Her testimony arguably corroborated
Kelley's testimony that ATPE was in control of the premises during the renovation project. 
Wallingford's proposed instruction assumes a material controverted fact--that Kelley was in control
of the premises--and is therefore affirmatively incorrect. See Adams v. Valley Fed. Credit Union,
848 S.W.2d 182, 187 (Tex. App.--Corpus Christi 1992, writ denied) (holding that plaintiff's
requested instruction was affirmatively incorrect because it assumed hotly contested material
fact--plaintiff's qualifications for her job); see also London v. Merriman, 756 S.W.2d 736, 742
(Tex. App.--Corpus Christi 1988, writ denied). 

 Wallingford's proposed instruction fails to meet the substantially correct
requirement in two other aspects. A substantially correct instruction must be in "substantially the
same form as the essential elements outlined in Corbin." Hernandez v. Kroger Co., 711 S.W.2d
3, 4 (Tex. 1986); see also Prudential Ins. Co. of Am. v. Henson, 753 S.W.2d 415, 417 (Tex.
App.--Eastland 1988, no writ). Wallingford correctly asserts that issues or instructions do not
have to be in any precise form in order to preserve error. All that is necessary is that they be
"substantially" or essentially correct. In H.E. Butt Grocery Co. v. Warner, 845 S.W.2d 258
(Tex. 1992), the plaintiff requested submission in the precise form dictated by Corbin. Instead,
the court submitted instructions in "granulated" form. The supreme court held:



Although submitted in granulated form, the jury questions contained the proper
elements of a premises liability action. Because the charge fairly submitted to the
jury the disputed issues of fact and because the charge incorporated a correct legal
standard for the jury to apply, we hold that the trial court's refusal to submit [the
plaintiff's] tendered question and instruction did not amount to harmful error.



Id. at 260 (emphasis added). In contrast, Wallingford's proposed instruction improperly refers
to a "particular activity" rather than "a condition on the premises." This instruction fails to
comport with Corbin and Keetch, which clearly distinguish negligent activity cases from premises
liability cases and only require an instruction on the duty owed an invitee by the owner of the
premises in a premises liability case. In addition, Wallingford's proposed instruction sets out a
standard of care owed an invitee by an owner/occupier/manager/contractor based upon the
testimony of Wallingford's expert, Dr. James Wood. This language greatly expands the standard
of care Corbin and Keetch impose upon owners and occupiers of a premises and thus sets out an
incorrect legal standard.

 Wallingford had the duty to present the trial court with an instruction that was not
affirmatively incorrect. We hold that Wallingford's requested instruction was incorrect, thereby
failing to preserve any trial court error in submitting the case under a general negligence theory
rather than a premises liability theory. Therefore, we overrule Wallingford's first two points of
error.


 

B.  Sufficiency of the Evidence to Support the Jury Verdict

 In three points of error, Wallingford challenges the sufficiency of the evidence to
support the jury's verdict. She complains in her fourth and fifth points of error that the trial court
erred in overruling her motion for JNOV because the evidence was legally and factually
insufficient to support the jury's failure to find that appellees were negligent. She complains in
her third point of error that the trial court erred in overruling her motion for new trial because the
evidence established appellees' negligence as a matter of law. 

 Wallingford had the burden of proof to establish appellees' negligence. When the
appellant had the burden of proof on an issue that was answered adversely, a "no-evidence" point
should be styled as "a matter of law" point. William Cornelius, Appellate Review of Sufficiency
of the Evidence Challenges in Civil and Criminal Cases, 46 Tex. Bar J. 439, 440 (1983). When
an appellant with the burden of proof on an issue challenges the "factual sufficiency" of the
evidence to support the jury's verdict, the proper point is that the adverse finding was against the
great weight and preponderance of the evidence. Id. Wallingford raised a "no-evidence" or
"matter of law" point in her third and fourth points of error, and she attempted to raise a "factual
insufficiency" point in her fifth point of error. 

 Under the common-law doctrine of negligence, three elements must be established: 
"1) a legal duty owed by one person to another; 2) a breach of that duty; and 3) damages
proximately resulting from the breach." Greater Houston Transp. Co. v. Phillips, 801 S.W.2d
523, 525 (Tex. 1990). In order to meet her burden of proof, Wallingford first had to establish
that appellees owed her a legal duty. The existence of a legal duty is a question of law for the
court to decide from the facts surrounding the occurrence in question. Id. The trial court
submitted the case under a general negligence theory, thus defining negligence as "failure to use
ordinary care, that is, failing to do that which a person of ordinary prudence would have done
under the same or similar circumstances or doing that which a person of ordinary prudence would
not have done under the same or similar circumstances." An owner or occupier of a premises
owes invitees a legal duty to use "ordinary care that a reasonably prudent person would exercise
under all the pertinent circumstances." Corbin, 648 S.W.2d at 295. Appellees do not contest that
they owed a duty of care to Wallingford; however, they dispute Wallingford's claim that they
breached that duty and thus were negligent. 

 With respect to the issue of breach of duty, "an occupier's liability to an invitee
depends on whether he acted reasonably in light of what he knew or should have known about the
risks accompanying a premises condition." Id. Thus, in order to establish an
occupier/defendant's negligence, the plaintiff must prove: (1) the defendant breached the
applicable standard of care because it had actual or constructive knowledge that a dangerous
condition existed on the premises; (2) the condition posed an unreasonable risk of harm to the
plaintiff; and (3) the defendant did not exercise reasonable care to reduce or to eliminate the risk. 
See id. at 296. (2)

 In order to establish appellees' negligence, Wallingford first had to prove that they
had actual or constructive knowledge of a dangerous condition on the premises that posed an
unreasonable risk of harm to her. Wallingford argues that appellees knew or should have known
that the building's ventilation system and the chemicals and solvents used in the renovation project
created a risk of exposure that could result in adverse health effects, neurotoxic injuries, and even
death. According to Wallingford, the combination of the faulty ventilation system and the
hazardous chemicals contained in the products used in the renovation amounted to an unreasonable
risk of harm. 

 To prove that appellees knew or should have known of the dangerous condition,
Wallingford offered into evidence the testimony of Dr. Woods, a bioenvironmental engineer (3) who
testified that the ventilation system in Centennial Towers violated Austin city codes as well as
codes set by the American Society of Heating, Refrigeration and Air Conditioning Engineers
("ASHRAE") and that the poor ventilation system was insufficient to properly ventilate the
chemicals. Dr. Woods further testified that appellees knew or should have known about the
ventilation system defect and were negligent in not remedying the defect. 

 Wallingford relied on the testimony of Gary Sauls and Phillip Masden to establish
that the chemical exposure posed an unreasonable risk of harm to her. Sauls and Masden were
employees of Devoe and Raynolds, the company that sold the products for the renovation project
to contractor James Kelley. Sauls and Masden testified that the products Kelley used all posed
hazards that required the user to take certain precautions, such as adequate ventilation. They
further testified that a material safety data sheet ("MSDS") for each product that listed such
hazards was available to appellees upon request. In addition, Wallingford introduced testimony
of Dr. Marvin Legator and Dr. Thomas Callender, who described in detail the hazards of the
chemicals and solvents contained in the products used in the renovation.

 In response, appellees offered the testimony of their own expert, Gil Kent, to rebut
Dr. Woods's testimony. Kent is a design engineer who has designed numerous electrical and
mechanical systems, including many of the HVAC systems used in Austin. He testified that
Centennial Towers's HVAC system met applicable codes and standards in place when the building
was built, and that the building had been inspected and approved by the City of Austin to be in
compliance with the codes. (4) Kent concluded that the ventilation system was adequate. 
Furthermore, on cross-examination, appellees elicited from Dr. Woods an admission that he had
never designed an HVAC system like the one installed in Centennial Towers and that he had only
designed one HVAC system in his entire career.

 Appellees also produced evidence to negate Wallingford's assertion that the
renovation project created an unreasonable risk of harm to her. Kent inspected the building and
concluded that the reception area where Wallingford had worked was physically isolated from the
area of construction by sheetrock walls on both sides of the room running from the floor of the
reception area to the floor of the room above. He concluded that it was physically impossible for
fumes to have been vented into Wallingford's work area from the construction site because there
were no return air ducts in any of the areas under construction. In addition, Dr. Thomas Lowry
and Dr. Joe Juren both testified that data concerning the concentration of chemicals is very
important in determining whether chemical exposure is dangerous, as Wallingford's own expert,
Dr. Legator, conceded. Dr. Woods admitted on cross-examination that he could not quantify the
amount of Wallingford's exposure to any potentially toxic substance used in the remodeling, and
Dr. Juren concluded based on his examination of Wallingford's medical records that if
Wallingford suffered from toxic exposure of any kind, it was probably "very minor, very
minimal." 

 To prove that appellees failed to exercise reasonable care to reduce or eliminate any
unreasonable risk of harm to her, Wallingford relied on the testimony of Dr. Woods. Dr. Woods
testified that based upon custom, practice, and industry standards, an owner/manager/contractor
has a duty to determine the content and potential toxicity of products being used in a renovation
and construction project, which requires familiarity with the contents of the MSDS for every
product used on the project, and to warn all building occupants of potential hazards and
completely isolate them from exposure or evacuate them. He then testified that appellees took
none of these steps to reduce or eliminate the risks. Furthermore, Wallingford claims that Kelley
admitted on cross-examination that no precautionary measures were taken due to excessive
expense, conceding that precautionary steps would have made the renovation project safer for the
building's occupants. (5) She also points to the testimony of several ATPE employees, who testified
that no one warned them that toxic chemicals were in use or about the potential hazardous effects
of exposure.

 Appellees offered into evidence testimony that rejected Dr. Woods's suggested
standard of care. Rebutting Dr. Woods's assertion that the contractor had a duty to check the
MSDS of each product used on the project for hazardous chemicals, Kelley testified that he relied
on the architect's specifications ATPE provided him in accordance with industry practice: "I had
clear specs on what to put in the space . . . . It was real simple. You go A, B, you know, put
metal studs, Sheetrock, wood, paneling, doors, paint it and carpet, sealants and you are out of
there." When asked on cross-examination whether he put safety over money, Kelley testified:



Q: (By Mr. Musselwhite) Do you put safety over money or money over safety?


A: I follow what was spec'd on the job.


Q: Well, if the specs ---


A: If there was something wrong with the job, I would point it out to ATPE what
I saw. I didn't see anything wrong with this job.


Q: Let me put it this way, do you or do you not have the rule or the policy that
when you get into a job you want to check it out to make sure, do everything
that you can within your power to make certain that whatever you do on that
job, knowing people are going to be working in the vicinity, that they are not
going to be injured by what you do? You try to do that, don't you?


A: Yes, sir, I do. 



In addition, Kent, appellees' expert, testified that the need to isolate or evacuate building
occupants depends upon the quantity of fumes, which Wallingford did not establish. Kent testified
on cross-examination:



Q: Would you agree with Dr. Woods that to do it, in addition to making sure that
you have an adequate, airtight barrier, as much as you can make it airtight, if
that barrier is not sufficient to keep the fumes out of the areas where people
are working, then with those kind of products that put off those kinds of
hazardous fumes, it would be prudent to then evacuate, have exhaust fans, or
use some method to evacuate that air out so that it would not go into the areas
where people are remaining there all day, wouldn't it, sir?


A: If the quantity were such that would be harmful. I am not sure that anyone
can establish that. (6)


 . . . .


Q: And would you recommend, if they are going to use those kind of products
and--in the construction on either side, as the diagram shows on either side of
Ms. Wallingford's place, . . . there could be construction of those kind of
products wouldn't you recommend, sir, that at least they do some testing to
see if the air quality was getting down so bad that it might be harmful?


A: Again I don't know what the construction consisted of, what--and what kind. 
If there were a substantial amount, I would say yes. If it wasn't, then no.


 . . . . 


Q: Well, let's assume [the construction] involved enough that several people were
getting--were complaining about it, headaches, burning eyes, that kind of thing,
wouldn't you, if you were on staff or consultant or that company that owned
and operated that building or was doing the contract work, wouldn't you
recommend to them that they do some testing and--


A: If there were multiple complaints, yes.



(Emphasis added.) Kelley testified that no one complained about the fumes or problems resulting
from the fumes. This was corroborated by several of Wallingford's co-workers, who testified that
although the fumes were bothersome, they did not complain to anyone. On redirect, Kent
explained to the jury that the steps taken to isolate or ventilate a work area depend on the quantity
of chemicals used and that massive ventilation is not needed with, for example, typical painting
projects.

 Appellees also introduced evidence that precautionary measures were taken. Kelley
testified that steps were taken to isolate employees from the fumes, particles, and noises generated
by the renovation. He explained that the demolition required for the renovation, which involved
pulling down sheetrock sections, was done only on the weekend. Kelley further testified that he
isolated the area under renovation by hanging heavy plastic barriers around the area to keep dust
from transferring into other parts of the building.

 Wallingford alleges in her fourth point of error that the trial court erred in denying
her motion for JNOV because there was no evidence to support the jury's failure to find that
appellees were negligent. (7)
 In her third point of error, Wallingford claims that the trial court erred
in overruling her motion for new trial because appellees were negligent as a matter of law. These
points of error both raise "matter of law" points. In reviewing "matter of law" points, we must
consider all of the evidence, and if the converse of the jury's finding is established conclusively,
we will sustain the point of error. Cornelius, supra, at 440. Having considered all of the
evidence, we conclude that Wallingford failed to conclusively establish appellees' negligence. 
Therefore, we overrule her third and fourth points of error. 

 For purposes of appeal, a complaint that the trial court erred in failing to grant a
motion for JNOV raises only a "no evidence" point. Southwestern Bell Tel. Co. v. Sims, 615
S.W.2d 858, 861 (Tex. Civ. App.--Houston [1st Dist.] 1981, no writ) (citing Chemical Cleaning,
Inc. v. Chemical Cleaning & Equip. Serv., Inc., 462 S.W.2d 276 (Tex. 1970)). However, we
will assume arguendo that Wallingford's fifth point raised a point of error asserting that the jury's
verdict was against the great weight and preponderance of the evidence. A "great weight" point
requires us to consider and weigh all the evidence and set aside the judgment only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951);
see also Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex. 1986); Cornelius, supra, at 441. We
have weighed all the evidence and determine that the trial court's judgment is not against the great
weight and preponderance of the evidence. We accordingly overrule Wallingford's fifth point of
error.



C.  Motion for Continuance

 In her sixth point of error, Wallingford contends that the trial court erred in denying
the September 8, 1992 motion for continuance filed by her attorneys Richard Roth and Hector
Uribe and her pro se motion for continuance filed September 11, 1992. Wallingford's first
attorney, Joe Johnson, filed her original petition in May 1989. On January 25, 1990, Johnson
filed a motion to withdraw as Wallingford's counsel, attaching Wallingford's statement that she
no longer wanted him to represent her. On August 31, 1990, Wallingford designated Don Black
as her attorney. The case was set for trial on November 4, 1991. In July 1991, Black filed a
motion to withdraw because he could no longer afford to pursue the litigation; the court granted
the motion on August 13, 1991. In its order granting Black's motion, the trial court agreed to
grant an expedited hearing on Wallingford's motion for continuance if she could find a lawyer to
take her case. 

 On November 5, 1991, the trial court allowed Roth and Uribe to appear as
Wallingford's counsel; the court also ordered a continuance of the November 4, 1991 trial setting
and reset the case for trial on September 14, 1992. In its order, the trial court stated:



In the event Plaintiff should in the future discharge her attorneys they shall be
permitted to withdraw but, no further continuance will be granted on such grounds
and Plaintiff will be required to proceed Pro Se, or through representation by
additional or new counsel whose appearance, if any, will be subject to and
expressly conditioned upon adherence to the trial setting and Pre-Trial Order as set
forth herein. 



Roth and Uribe filed a motion for continuance on January 31, 1992, alleging that Wallingford's
two prior attorneys had done nothing in her case. The court denied the motion. On September
4, 1992, Roth and Uribe filed a motion to withdraw on grounds that Wallingford had effectively
terminated them as her attorneys and had made it impossible for them to effectively represent her. 


 In a September 8, 1992 motion, Wallingford, Roth, and Uribe requested that Benton
Musselwhite be substituted as counsel of record and that the court continue the trial setting for at
least forty-five days from the date of the order granting such continuance. In the motion,
Musselwhite conditioned his agreement to substitute as counsel upon the granting of the
continuance. In a hearing held that day, the court gave Wallingford three options: try the case
pro se, go to trial with Roth and Uribe, or go to trial with a new attorney if she could find one. 
Regardless of which option she selected, the court instructed that the case was going to trial on
September 14, 1992. Wallingford persisted in her decision to terminate Roth and Uribe, and the
court granted their motion to withdraw as counsel.

 Wallingford filed a pro se motion for continuance on September 11, 1992. In her
motion, she claimed that she could not be present at trial because her medical, emotional, and
psychological condition required immediate hospitalization and that three of her expert
witnesses--Dr. Woods, Dr. Callendar, and Dr. Richard Austin--had prior engagements that
prevented them from appearing at trial. The trial court denied her motion, and the case went to
trial on September 14, 1992. Musselwhite represented Wallingford at trial. Wallingford was
present and testified during the trial, as did Dr. Woods, Dr. Callendar, and Dr. Austin.

 The Texas Supreme Court has made clear that the granting or denial of a motion
for continuance is within the sound discretion of the trial court. Villegas v. Carter, 711 S.W.2d
624, 626 (Tex. 1986). "Absent a manifest showing of abuse of discretion, the trial court's
decision will not be disturbed." LaChance v. Hollenbeck, 695 S.W.2d 618, 620 (Tex.
App.--Austin 1985, writ ref'd n.r.e.). The supreme court has instructed:



The trial court's action will not be disturbed unless the record discloses an abuse
of discretion. When the ground for the continuance is the withdrawal of counsel,
movants must show that the failure to be represented at trial was not due to their
own fault or negligence.



Villegas, 711 S.W.2d at 626. In Villegas, the court noted that the failure to obtain counsel for
trial was not due to the petitioner's own fault or negligence and determined that the trial court had
abused its discretion. Id. In LaChance, this Court confronted a situation where the appellant
discharged his attorney four days before trial. We concluded that the trial court's refusal to grant
a second continuance to a party who discharged his attorney days before trial and who had been
given a two-day continuance to find another attorney was not an abuse of discretion. LaChance,
695 S.W.2d at 620.

 Wallingford contends that she was not negligent or at fault in being without a
lawyer days before trial. According to Wallingford, all of her prior attorneys had withdrawn
through no fault of her own, and she was forced to terminate Roth and Uribe's representation
because they had failed to get the case ready for trial and, more importantly, because a fatal
conflict of interest had developed. She argued that they had, against her will, and "for the
apparent purpose of forcing an unacceptable settlement down her throat," sought to have a
guardian ad litem appointed for her. Thus, she argues, the trial court abused its discretion in
denying the motions for continuance. We disagree.

 The record in the present case reflects that over a three-year period, Wallingford
had four different sets of attorneys. The first trial setting of November 4, 1991 was continued
at her request for ten months to allow her time to obtain new representation--Roth and Uribe--and
to give new counsel sufficient time to prepare for trial. The court made clear in its order that if
Wallingford decided to discharge Roth and Uribe, no continuance would be granted. In spite of
this order, Wallingford chose to discharge them. Unlike the situation in Villegas, where
appellant's attorneys "withdrew" two days before trial, Wallingford discharged Roth and Uribe,
notifying them several months before trial that she was terminating their services to hire another
law firm. The record reflects that Wallingford advised Roth and Uribe in mid-August of 1992
that a new firm had accepted her case and that Roth and Uribe made the entire file available to
Wallingford by August 5, 1992. (8) Based on our review of the record, we conclude that the trial
court did not abuse its discretion in denying the motions for continuance. We therefore overrule
Wallingford's sixth point of error.



D.  A Fair Trial Before an Unbiased Judge

 Wallingford asserts in her seventh point of error that the trial judge's bias,
prejudice, and lack of impartiality made it impossible for her to receive a fair trial. In support
of her argument, she complains that the judge disparaged her and her counsel both before and
outside of the jury's presence, admitted highly prejudicial, irrelevant evidence offered by
appellees, and refused to admit relevant, admissible evidence offered by her counsel. (9)

 To reverse a judgment based on the judge's partiality or bias, we must find "(1) that
judicial impropriety was in fact committed, and (2) probable prejudice to the complaining party." 
Metzger v. Sebek, 892 S.W.2d 20, 38 (Tex. App.--Houston [1st Dist.] 1994, writ denied); Pitt v.
Bradford Farms, 843 S.W.2d 705, 706 (Tex. App.--Corpus Christi 1992, no writ); see also Tex.
R. App. P. 81(b)(1). A presiding judge is responsible for controlling the general conduct and
management of the trial. Metzger, 892 S.W.2d at 38; Pitt, 843 S.W.2d at 706. In order to fulfill
this responsibility, the judge has "inherent power" to control the disposition of the cases before
it "with economy of time and effort for itself, for counsel, and for litigants." Landis v. North Am.
Co., 299 U.S. 248, 254 (1936). "How this can best be done calls for the exercise of judgment,
which must weigh competing interests and maintain an even balance." Id. at 254-55. In Texas,
a trial judge's "inherent power" coupled with the applicable Texas Rules of Civil Procedure and
Texas Rules of Civil Evidence accord a trial court broad, though not unfettered, discretion in
handling trials. (10)

 Pursuant to its inherent power, a presiding judge has discretion in expressing
himself or herself while managing a trial. Metzger, 892 S.W.2d at 38. This discretion, however,
is not unlimited. The general rule is that a presiding judge must conduct the trial in a fair and
impartial manner and refrain from verbally confronting or displaying displeasure toward counsel,
especially in the presence of the jury, and from making unnecessary comments or remarks that
may result in prejudice to a party. Brown v. Russell, 703 S.W.2d 843, 847 (Tex. App.--Fort
Worth 1986, no writ); see also Metzger, 892 S.W.2d at 38; Pitt, 843 S.W.2d at 706. Lawyers
have a corresponding responsibility "to conduct themselves with respect for the tribunal and the
legal system." Shaw v. Greater Houston Transp. Co., 791 S.W.2d 204, 211 (Tex. App.--Corpus
Christi 1990, no writ). Neither lawyers nor parties should conduct themselves in a manner likely
to provoke proper admonishment from the court. Metzger, 892 S.W.2d at 39. 

 In order to determine whether to reverse a judgment based on judicial impropriety,
we must examine the entire record. Id. We have reviewed the statement of facts in this case. 
Most of the complained of interactions between the judge and Wallingford's attorneys were
innocuous. Many were just exchanges during which the judge disagreed with Wallingford's
counsel on some point, for example, when the judge would sustain an objection made by defense
counsel or overrule an objection made by her counsel. In some of these instances, unpleasant
conflict and noticeable tension developed on both sides. The judge was on occasion frustrated and
short with Wallingford's attorneys. In a drastic example of his frustration with Wallingford
herself, the judge excused the jury and warned Wallingford and her counsel of the consequences
of aggravated perjury. There is little doubt, however, that Wallingford's attorneys invited the
judge's frustration and impatience in large measure. For example, Wallingford's counsel violated
orders in limine and other orders of the court, argued with and insulted the judge, made derisive
comments about witnesses, explored irrelevant matters, and made spurious objections.

 In several instances, the judge's remarks and demeanor may indeed have produced
the impression in the minds of the jury that he was impatient, frustrated, or even angry with
Wallingford's counsel. This is unfortunate. However, Wallingford's counsel created an
atmosphere in the courtroom that invited such responses, and we find no evidence in the record
that the judge's impatience was anything more than that, and no evidence of bias against
Wallingford or her attorneys. The judge did not become an advocate for the defense; rather, he
asserted his authority to manage the control of the courtroom and the disposition of the case. (11) 
We hold that Wallingford has not shown the prejudice required for us to reverse and remand on
this ground and overrule her seventh point of error.



E.  Admissibility of Evidence

 In her eighth point of error, Wallingford asserts that the trial court erred in allowing
inadmissible evidence of her prior abortions, HIV test, and a visit to a battered women's clinic. (12) 
In addition, she raises a number of complaints concerning evidentiary rulings in her argument
under points of error seven and eight. We will address only those alleged errors for which she
provides authority. (13)

 Wallingford argues that the trial court committed reversible error by admitting
irrelevant and highly prejudicial evidence of her prior abortions, HIV and leukemia tests, visit to
a battered women's shelter, injuries sustained in 1981 due to a fall on an airplane and a car wreck,
and complaints against her relating to her alleged employment discharges or terminations. She
further asserts that the trial court erred by allowing appellees to offer into evidence an
inadmissible medical summary. We first address the evidence that Wallingford claims is
irrelevant and highly prejudicial. 

 The Rules of Civil Evidence provide that all relevant evidence is admissible unless
otherwise provided by Constitution, by statute, or by the rules themselves and that irrelevant
evidence is inadmissible. Tex. R. Civ. Evid. 402. Evidence is relevant if it has "any tendency
to make the existence of any fact that is of consequence to the determination of the action more
probable or less probable than it would be without the evidence." Tex. R. Civ. Evid. 401. 
Wallingford, her husband, friends, and medical providers testified that she was in good health
before the exposure. Wallingford also introduced testimony about her career opportunities and
diminished potential resulting from the exposure. Her claims opened the door to a full
examination of other possible causes for her condition and situation. Dr. Richard Coons, a
psychiatrist and one of appellees' experts, testified based on a review of Wallingford's medical
and employment records that her condition resulted from psychological, rather than medical,
causes. According to Coons, Wallingford suffers from malingering, which is the production of
false symptoms for some sort of gain, and somatization, which involves the conversion of anxiety
or difficulties in life into physical symptoms. All of the evidence Wallingford objects to as
irrelevant makes more probable appellees' theory that she has a long history of the same types of
complaints and problems from which she is now suffering and less probable her theory that her
condition resulted from her exposure at Centennial Towers. (14)

 Wallingford also contends that the evidence should not have been admitted because
of its highly prejudicial nature. Texas Rule of Civil Evidence 403 requires that relevant evidence
be substantially outweighed by the danger of unfair prejudice to be excluded. Tex. R. Civ. Evid.
403. Because of the severe consequences of applying Rule 403--the exclusion of relevant
evidence--the application of the rule "is an extraordinary remedy that must be used sparingly." 
LRS Joint Venture No. 2 v. Callewart, 837 S.W.2d 693, 698 (Tex. App.--Dallas 1992, writ
denied). "In weighing the prejudice, the court must first examine the necessity for and probative
effect of the evidence." Id. The most effective way for appellees to rebut Wallingford's
contention that her exposure caused her medical, psychological, and personal problems is to show
that these problems existed long before the incident, and any prejudicial effect of this evidence
does not substantially outweigh its probative value. The evidence was therefore admissible.

 Wallingford also contends that the court erred in admitting appellees' medical
summary. According to Wallingford, the law controlling medical summaries was originally laid
down by the Texas Supreme Court in Loper v. Andrews, 404 S.W.2d 300 (Tex. 1966), and
reiterated in Liberty Mutual Fire Insurance Co. v. Lynch, 624 S.W.2d 698 (Tex. Civ. App.--El
Paso 1981, no writ), and Texas Imports v. Allday, 649 S.W.2d 730 (Tex. App.--Tyler 1983, no
writ). These cases have nothing to do with medical summaries. Rather, they address the
admissibility of medical records containing opinion testimony. Thus, Wallingford offers no
authority for her contention that the court erred in admitting the medical summary and thus has
failed to preserve error. Furthermore, Wallingford's attorneys made no objection at trial to the
admissibility of the exhibit, thereby waiving any objections she may have had. (15)

 Assuming arguendo that Wallingford had preserved error, we conclude that the trial
court was well within its discretion in admitting the summary of Wallingford's medical records. 
Wallingford introduced extensive testimony, testing results, and medical records relating to her
medical condition. Texas Rule of Civil Evidence 1006 provides that the "contents of voluminous
writings . . . otherwise admissible, which cannot conveniently be examined in court may be
presented in the form of a . . . summary." Tex. R. Civ. Evid. 1006. Wallingford's numerous
medical records in this case were appropriate for summary presentation. The appellees laid the
proper predicate for admissibility of the medical summary at issue, and the person who prepared
the summary testified as to how the summary was prepared. Based on our conclusion that the trial
court did not err in admitting any of the aforementioned evidence, we overrule Wallingford's
eighth point of error.



CONCLUSION


 Having overruled all of Wallingford's points of error, we affirm the judgment of
the trial court. 



 

 Jimmy Carroll, Chief Justice

Before Chief Justice Carroll, Justices Aboussie and Jones

Affirmed

Filed: June 7, 1995

Do Not Publish

1.   Because we decide this point of error on procedural grounds, we find it unnecessary
to determine under which of the two theories the case should have been submitted.
2.   In order to succeed on a negligence claim, a plaintiff must prove negligence,
causation, and damages. The causation prong requires the plaintiff to prove that the
defendant's failure to use reasonable care proximately caused plaintiff's injuries. Corbin,
648 S.W.2d at 295. Because Wallingford only challenges the jury's findings on the issue of
negligence, we do not address the issue of causation. 
3.   A bioenvironmental engineer has special training in physiology, chemistry,
biochemistry, physiological chemistry, histology, and physiological systems and works to
understand how the physical environment affects the human body.
4.   Wallingford claims in her brief that Kent agreed with Woods that the ASHRAE
standards were violated in this case.
5.   Kelley did in fact admit on cross-examination that he did not consult a toxicologist,
industrial hygiene expert, or HVAC expert at any time during the renovation. However,
he did not testify that no precautionary steps were taken because of the expense but rather that
precautionary steps were not taken unless called for by the job specifications.
6.   Wallingford claims that Kent, appellees' expert, "corroborated" the testimony of
Dr. Woods.
7.   Wallingford contends that the jury's finding that she was injured by exposure to
chemicals at Centennial Towers established as a matter of law that appellees owed her the
duty to warn, protect, and maintain a safe work place. Question one of the jury charge
asked: "Was Cheryl Wallingford injured by exposure to chemicals at Centennial Towers
during June - July 1988?" The jury answered, "Yes." However, the jury answered "No"
with respect to all appellees when asked in question two whether the negligence of any
persons named below proximately caused her injuries.


8.   In Villegas, the court was persuaded by the fact that the appellant's attorney would not
turn over his files. The court observed, "The attorney did not give Villegas time to employ
new counsel or deliver to Villegas the papers and property to which Villegas was entitled." 
711 S.W.2d at 627.
9. [9]  Wallingford argues that the court's erroneous evidentiary rulings reflect its lack of
impartiality and its effect on her ability to have a fair trial. We will address Wallingford's
complaint that the court lacked impartiality and then separately address her claim that the court
made erroneous evidentiary rulings.
10.   For example, Texas Rule of Civil Evidence 611 instructs: 


The court shall exercise reasonable control over the mode and order of
interrogating witnesses and presenting evidence so as to (1) make the
interrogation and presentation effective for the ascertainment of truth, (2) avoid
needless consumption of time, and (3) protect witnesses from harassment or
undue embarrassment.


Tex. R. Civ. Evid. 611 (emphasis added).
11.   In making this determination, it is unnecessary for us to set out and analyze each
episode of conflict cited by appellants. To do so would unduly extend this opinion and
would benefit no one. See Metzger, 892 S.W.2d at 39; Best Inv. Co. v. Hernandez, 479
S.W.2d 759, 761 (Tex. Civ. App.--Dallas 1972, writ ref'd n.r.e.).
12.   In point of error eight, Wallingford also complains that the court threatened and
intimidated her with aggravated perjury and that the judge rolled his eyes and turned
away from her witnesses while it listened attentively to appellees' witnesses. These
arguments are controlled by our disposition of her seventh point of error.
13.   Where an appellant cites no authority in support of a point of error, the court
should overrule the point of error. See Teague v. Bandy, 793 S.W.2d 50, 58 (Tex.
App.--Austin 1990, writ denied).
14.   For example, Wallingford testified that the exposure caused excessive vaginal
bleeding. Medical records documented a long history of excessive vaginal bleeding, and
the records from the Center for Battered Women indicate that Wallingford told them that
sexual abuse from her brother had resulted in bruises and internal bleeding or pain. 
Therefore, evidence of the prior abortions and sexual abuse was relevant to her claims. 
She also testified that the exposure had caused neck and back problems. Wallingford
suffered neck and back injuries as a result of the 1981 accidents; thus, that evidence is
also relevant to whether her exposure caused the symptoms. The evidence of testing for
HIV and leukemia is consistent with Dr. Coons's diagnosis that Wallingford suffered
from somatization and thus relevant to her claims. 
15.   Wallingford responds that she preserved error by filing motions in limine objecting
to the documents, which the court overruled. A motion in limine is designed solely to
require an offering party to approach the bench and inquire into the admissibility of the
evidence at issue before introducing the evidence to the jury. See Hartford Accident &
Indem. Co. v. McCardell, 369 S.W.2d 331, 335 (Tex. 1963). The granting or denial of a
motion in limine has no bearing on the ultimate admissibility of the evidence. Id. Thus,
Wallingford misplaces her reliance on a motion in limine to preserve error for appeal.